# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MATTHEW LOBDELL, on behalf of )
himself and all others similarly situated )
                                 )
        Plaintiff, )
                                 )    Case No. 24-cv-11450
v. )
                                 )    Hon. Nancy G. Edmunds
WHITE CAP, L.P. (f/k/a HD Supply )
Construction Supply); WHITE CAP )    Red. David R. Grand
SUPPLY HOLDINGS, LLC, and )
WHITE CAP MANAGEMENT, LLC, )
                                 )
        Defendants. )

## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants White Cap, L.P., White Cap Supply Holdings, LLC, and White Cap Management, LLC (collectively, "Defendants" or "White Cap"), by and through their undersigned counsel, hereby file their Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c), and in support file the attached Brief in Support of Motion for Judgment on the Pleadings.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS ................................................................................................ 1

I.   INTRODUCTION AND FACTUAL BACKGROUND ............................ 1

II.   ARGUMENT ........................................................................................ 5

  A.  Standard of Review for a Rule 12(c) Motion. ................................... 5

  B.  Statutory Frameworks Applicable to Wellness Programs. ................ 6

    i.   *The ADA* ....................................................................................... 6

    ii.  *ERISA and the Public Health Services Act (as Amended by the Affordable Care Act).* ................................................................... 8

  C.  White Cap's Incentives for Participation in the Wellness Program Are Lawful, and Plaintiff's Attempts to Create an Ambiguity in the Statutory Text of the ADA Fail As a Matter of Law. ...................... 10

    i.   *The Court Should Not Defer to Agency Interpretation When Determining the Meaning of "Voluntary."* ................................. 11

    ii.  *The Court Must Apply the Rules of Statutory Construction to Determine the Meaning of "Voluntary."* ................................... 13

    iii. *The Only Court to Have Analyzed This Issue According to Canons of Statutory Construction Found a Wellness Program with a 100% Premium Surcharge Voluntary.* ................................................. 15

  D.  Plaintiff's Claims Regarding the Notice Also Fail. ....................... 19

    i.   *Plaintiff's Allegations That White Cap's Wellness Program Required Participants to Waive Confidentiality Protections Are Conclusory and Baseless.* .......................................................... 20

    ii.  *To the Extent There Were Any Technical Deficiencies in the Notice, White Cap Substantially Complied with the EEOC Regulations.* ............... 22

    iii. *Plaintiff Has Not Suffered Any Prejudice or Concrete Harm Due to a Purported Deficiency in the Notice.* ....................................... 23

  CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. Life Ins. Co. of N. Am.*,
  No. 1:11-CV-02922-AT, 2012 WL 13055953 (N.D. Ga. July 5, 2012).............25
*Arangure v. Whitaker*,
  911 F.3d 333 (6th Cir. 2018) ......................................................................... 14, 25
*Bailey v. CIGNA Ins. Co.*,
  87 Fed. App. 347 (5th Cir. 2004) .........................................................................25
*Coker v. State*,
  33 S.E.2d 171.........................................................................................................20
*Corey v. Sedgwick Claims Mgmt. Servs.*,
  165 F. Supp. 3d 672 (N.D. Ohio 2016) ................................................................25
*Delker v. MasterCard Int'l, Inc.*,
  21 F.4th 1019.........................................................................................................26
*EEOC v. Orion Energy Sys., Inc.*,
  208 F. Supp. 3d 989 (E.D. Wis. 2016) .................................................... 22, 23, 24
*In re Anheuser-Busch Beer Labeling Mktg. & Sales Practices Litig.*,
  644 Fed. Appx. 515 (6th Cir. 2016) .....................................................................24
*In re Weatherspoon*,
  605 B.R. 472 (Bankr. S.D. Ohio 2019) ................................................................19
*Lacy v. Fulbright & Jaworski*,
  405 F.3d 254 (5th Cir. 2005) ................................................................................29
*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024) .................................................................. 4, 14, 16, 17, 18
*Lowden v. County of Clare*,
  709 F. Supp.2d 540 (E.D. Mich. 2010) ..................................................................7
*Martin v. Feeny Chrysler-Dodge of Gaylord, Inc.*,
  No. 09-12513-BC, 2010 WL 3623206 (E.D. Mich. Sept. 15, 2010) ...................29
*McKenna v. Dillon Transportation, LLC*,
  97 F.4th 471 (6th Cir. 2024).................................................................................25
*Mele v. Fed. Rsrv. Bank of New York*,
  359 F.3d 251 (3d Cir. 2004) .................................................................................25
*Moctezuma-Reyes v. Garland*,
  124 F.4th 416 (6th Cir. 2024)...............................................................................15
*Moler v. Univ. of Maryland Med. Sys.*,
  *No*. 1:21-CV-01824-JRR, 2022 WL 2716861 (D. Md. July 13, 2022) .. 26, 29, 30

*Moore v. LaFayette Life Ins. Co.*,
    458 F.3d 416 (6th Cir. 2006) .......................................................... 29, 30

*Morton v. Mancari*,
    417 U.S. 535 (1974) ...................................................................... 13, 25

*Nitz-Lentz v. Metro. Life Ins. Co.*,
    No. 1:24-CV-356, 2024 WL 4555413 (W.D. Mich. Oct. 10, 2024)...................25

*Payton v. Cnty. of Kane*,
    308 F.3d 673 (7th Cir. 2002) ........................................................31

*Pickens v. Hamilton-Ryker IT Sols., LLC*,
    133 F.4th 575 (6th Cir. 2025) ............................................... 15, 16, 17

*Pittsburgh & Conneaut Dock Co. v. Dir., Off. of Workers' Comp. Programs*,
    473 F.3d 253 (6th Cir. 2007) ........................................................21

*Ritter v. Bd. of Educ. of Arcadia Loc. Sch.*,
    535 F. Supp. 3d 690 (N.D. Ohio 2021) ...............................................7

*Stoletz v. State*,
    875 So.2d 572 (Fla. 2004) .............................................................24

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...................................................................... 30, 31

*Tucker v. Middleburg-Legacy Place*,
    539 F.3d 545 (6th Cir. 2008) ...........................................................6

*United States v. Bricker*,
    135 F.4th 427 (6th Cir. 2025) .......................................................15

*United States v. Hill*,
    963 F.3d 528 (6th Cir. 2020) .........................................................18

*United States v. Hunter*,
    12 F.4th 555 (6th Cir. 2021) .........................................................25

*United States v. Martinez–Salazar*,
    528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) .......................................24

*United States v. Small*,
    988 F.3d 241 (6th Cir. 2021) .........................................................18

*United States v. Zabawa*,
    719 F.3d 555 (6th Cir. 2013) .........................................................19

*Volz v. Volz*,
    167 Ohio St. 141, 146 N.E.2d 734 (1957)............................................19

Statutes

29 U.S.C. §1182 (a) ...............................................................................11
29 U.S.C. § 213(a)(1)............................................................................17
29 U.S.C. § 1182 ..................................................................................13

29 U.S.C. § 1182 (b)(2)(B) ........................................................................8
42 U.S.C. § 300gg-4 (j) ............................................................................8
42 U.S.C. § 300gg-4(j)(3) .......................................................................11
42 U.S.C. § 300gg-4(j)(3)(A) ..................................................................13
42 U.S.C. § 12101 .....................................................................................1
42 U.S.C. § 12111 ...................................................................................16
42 U.S.C. § 12111(5)(A) .........................................................................13
42 U.S.C. § 12112(d)(4)(B) ................................................................8, 13
42 U.S.C. § 12116 ...................................................................................16
42 U.S.C.§ 300gg-4 ................................................................................12
P.L. 111-148, §1563(e) ...........................................................................11

Rules

Fed. R. Civ. P. 12(c) ...................................................................... passim

Regulations

29 C.F.R. §2590.702(f) ...........................................................................11
29 C.F.R. § 1630.14 ..................................................................................2
29 C.F.R. § 1630.14 (d)(2)(iv) ........................................................ 3, 26, 29
29 C.F.R. § 1630.14 (d)(4)(iii) ..................................................................5
29 C.F.R. § 1630.14(d)(2) .......................................................................26
29 CFR 1630.14 (d)(2)(iv)(C) ..................................................................28
45 C.F.R. § 164.508 (c)(1)(iii) ...................................................................4
45 C.F.R. § 164.508 (c)(2)(i) and (iii) ......................................................28

Other Authorities

81 Fed. Reg. 31 (May 17, 2016) ................................................................8
466 ..........................................................................................................10
1990 U.S.C.C.A.N. 445 ...........................................................................10
H.R. REP. 101-485 ......................................................................... 9, 10, 22

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**

## I.   INTRODUCTION AND FACTUAL BACKGROUND

In this class action, Plaintiff Matthew Lobdell ("Plaintiff") alleges that White Cap's Wellness Program ("Wellness Program" or "Program"), specifically the Annual Physical Credit component of the Program, violates the Americans with Disabilities Act ADA, 42 U.S.C. § 12101 et seq. by requiring involuntary medical examinations to participate.[1] Specifically, Plaintiff claims that the physical and biometric screening conducted in connection with the Annual Physical Credit (the "Annual Physical") constitutes an "involuntary" medical examination for two reasons:

1.      Employees were allegedly "penalized" upwards of $1,500 per year for not participating by way of increased paycheck deductions for health insurance premiums, and said penalties or surcharges violate the ADA[2], and

2.      The notice/authorization provided to employees regarding participation in the Annual Physical Credit (the "Notice") requires that employees waive the confidentiality of their protected health information.[3]

With respect to Plaintiff's first claim, Plaintiff's allegations regarding the plan

---

[1] Second Amended Complaint ("SAC") at ¶ 111 (ECF No. 48).
[2] *Id.* at ¶¶ 111-113.
[3] *Id.* at ¶ 114, 120, 123, and 140.

structure and pricing are directly contradicted by the plan documents, which are properly considered on this Rule 12(c) motion as they are referenced in the SAC and are integral to Plaintiff's claims here.[4] These documents demonstrate that White Cap offered an incentive for participation in its Annual Physical Credit in the form of a discount on employee health insurance premiums, and that the incentive level was within the permissible limits set forth under the Affordable Care Act ("ACA").

Plaintiff's first claim fails for several other reasons. First, neither the ADA's statutory language nor the EEOC's regulations prohibit incentives for participation in employer Wellness Programs. Indeed, the regulations themselves make mention of potential "incentives" twice in their provisions.[5] Yet Plaintiff seeks to create an ambiguity in the statutory term "voluntary" within Title I of the ADA, by claiming that White Cap's incentives somehow rendered participation in the Annual Physical "involuntary." But Plaintiff avers that he declined to participate in the Annual Physical Credit program twice, and, therefore, never underwent an annual physical.[6] There are no allegations that he was ever denied health insurance coverage, was demoted, or was denied any advancement opportunities within White Cap for doing so. Plaintiff's own averments demonstrate that participation was voluntary.

---

[4] *See* ECF No. 73-1, 73-3, 73-4 (White Cap Benefit Plan Descriptions for years 2022 through 2024); ECF No. 73-2 (White Cap Benefit Plan Pricing from 2021 through 2024).
[5] *See* 29 C.F.R. § 1630.14.
[6] SAC ¶¶ 53 – 55, 61.

There are also no allegations within the SAC that White Cap's incentive levels ran afoul of the Affordable Care Act, which more specifically set incentive levels for employer-based wellness programs. The ADA's definition of "voluntary" should be interpreted according to its "ordinary meaning," and there is nothing within the ordinary meaning of "voluntary" that supports Plaintiff's theory that the ADA should be read to be in conflict with the ACA's **statutorily provided** incentive levels. The Court should interpret these two statutory frameworks in harmony.

With respect to Plaintiff's claims that the Notice somehow runs afoul of the ADA regulations, this argument also fails. As a threshold matter, this notice requirement stems from the EEOC's attempt to define "voluntary" in its Title I regulations.[7] But Congress did not grant authority to the EEOC to redefine the ADA's ordinary terms. Pursuant to *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Court should apply the ordinary meaning of the term "voluntary," which forecloses any further analysis regarding the Notice.

Even if the Court were inclined to defer to the EEOC's interpretation of "voluntary" (which requires notice), Plaintiff's allegations regarding the Notice are contradicted by the Notice's express terms.[8] For example, Plaintiff's allegation that the Notice requires an employee to authorize the "re-disclosure" of medical

---

[7] *See* 29 C.F.R. § 1630.14 (d)(2)(iv)
[8] ECF No. 73-5 (eHealth Screenings Notice and Authorizations)

information to any third party misinterprets a *required statement* that, pursuant to the Health Insurance Portability and Accountability Act ("HIPAA") regulations, must appear in all authorizations for medical records disclosures.[9] In fact, nothing in the Notice requires an employee to waive the confidentiality of their medical information. There is also nothing facially unlawful about White Cap receiving employee examination results (as disclosed in the Notice), provided they are in aggregated terms or only disclosed as necessary to administer the Wellness Program.[10] There are also no allegations in the SAC that White Cap was provided with individualized medical results in connection with its Wellness Program. Thus, Plaintiff's claims are foreclosed as a matter of law. Even if the Court were to find some technical deficiency in the Notice, White Cap "substantially complied" with the regulation and no further discovery is needed to make this determination.

Moreover, Plaintiff himself never signed the Notice, never participated in the Annual Physical Credit portion of the Wellness Program, and never had his screening results transmitted to a third party in connection with the Wellness Program.[11] Plaintiff has not suffered any concrete harm as a result of any deficiency in the Notice, and the mere risk of future harm *had he* participated is insufficient to sustain a claim for monetary damages. Thus, Plaintiff lacks Article III standing to

---

[9] *See* 45 C.F.R. § 164.508 (c)(1)(iii)
[10] *See* 29 C.F.R. § 1630.14 (d)(4)(iii)
[11] *See* SAC ¶¶ 53-55, 61

4

pursue any monetary damages as a result of the purportedly deficient Notice.

For these reasons, White Cap respectfully requests that judgment be entered on the pleadings in favor of Defendants and against Plaintiff, and that this case be dismissed prior to any determination on class certification.

## II.   <u>ARGUMENT</u>

### A.   **Standard of Review for a Rule 12(c) Motion.**

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, after the pleadings are closed, a party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). In such motion, "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (citation omitted).

When a court is presented with a Rule 12(c) motion, it may consider any pleadings and exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the motion, so long as they are referred to in the complaint and are central to the claims contained therein. *See, e.g., Lowden v. County of Clare,* 709 F. Supp.2d 540, 546 (E.D. Mich. 2010); *Ritter v. Bd. of Educ. of Arcadia Loc. Sch.,* 535 F. Supp. 3d 690, 693 (N.D. Ohio 2021) ("When ruling on a Rule 12(c) motion, I consider all available pleadings and can also consider 'any

documents attached to, incorporated by, or referred to in the pleadings.'") (citations omitted).

**B.    Statutory Frameworks Applicable to Wellness Programs.**

There are currently three statutory frameworks that have been interpreted as governing the operation of employer wellness programs in the United States: the ADA, ERISA[12], and the Public Health Services Act ("PHSA")[13], the latter two of which were amended by Congress as part of the Affordable Care Act. All three statutes, either through statutory text or their regulations, explicitly permit wellness programs such as White Cap's.

*i.    The ADA*

Plaintiff's claim is based on the ADA. The ADA makes clear that an employer "may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees…" 42 U.S.C. § 12112(d)(4)(B).[14] In the ADA, Congress paid short shrift to the requirements of these employer health programs, merely dictating that any medical examinations conducted in connection therewith be "voluntary."

Nothing within the text of the ADA prohibits using incentives to garner higher

---

[12] See 29 U.S.C. § 1182 (b)(2)(B).

[13] *See* 42 U.S.C. § 300gg-4 (j).

[14] The term "employee health program" has since been used interchangeably with "wellness programs." *See e.g.*, 81 Fed. Reg. 31, 126, at 31, 126 (May 17, 2016) (using the terms interchangeably).

levels of participation in wellness programs. Indeed, since (at the latest) the 1980s, companies have used incentives to encourage employee participation in such programs.[15] Despite knowledge of these incentivized programs at the time of the ADA's passage in 1990, Congress made no mention of these incentives when it decided that American companies could continue offering these wellness programs for their workforce. For example, the Committee on Education and Labor reasoned as follows with respect to employer wellness programs prior to the passage of the ADA in 1990:

> A growing number of employers today are offering voluntary wellness programs in the workplace. These programs often include medical screening for high blood pressure, weight control, cancer detection, and the like. As long as the programs are voluntary and the medical records are maintained in a confidential manner and **not used for the purpose of limiting health insurance *eligibilit*y** or **of preventing occupational advancement**, these activities would fall within the purview of accepted activities."

H.R. REP. 101-485, 75 1990 (emphasis added). While the Committee on Education and Labor did not give any specific definition of "voluntary," it appeared to give some shape to its usage by stating that the medical examinations could not be used "to determine health insurance eligibility" or to "prevent occupational

---

[15] For example, Johnson & Johnson's wellness program *Live for Life* offered financial rewards in the 1980s for participation in smoking cessation and weight loss programs. Bartz, Andrea, This Healthcare Company Is Determined to Have the Healthiest Employees in the World, available at https://www.jnj.com/innovation/how-johnson-johnson-is-improving-workplace-wellness-for-healthiest-employees (last accessed May 4, 2025).

advancement." *Id.* In other words, employers could not *penalize* employees by: (1) refusing to extend coverage, or (2) discriminating against them with respect to employment opportunities, due to their refusal to participate in, or the results of, these medical examinations or inquiries. See *Id.*

The Committee on the Judiciary further opined as follows prior to recommending the passage of the ADA:

> These voluntary corporate wellness programs have over the years uncovered employees with elevated blood pressure readings, glaucoma, lung cancer and other ailments for which the employee can then seek medical help. These programs can also be used, and are used, to provide treating physicians with x-ray and lab tests which help reduce the cost for medical care. This section does not preclude employers from continuing to offer these programs on a voluntary basis."[16]

> ii. *ERISA and the Public Health Services Act (as Amended by the Affordable Care Act).*

Then in 2010, Congress passed the Affordable Care Act ("ACA"), further outlining how to properly design and implement employer wellness programs. The ACA, which also amended HIPAA as to wellness programs[17], "create[d] new

---

[16] H.R. REP. 101-485, 43, 1990 U.S.C.C.A.N. 445, 466

[17] As originally enacted in 1997, HIPAA did not specifically address wellness programs; rather, it simply included a general prohibition against provisions in employer group health plans that discriminated against employees with respect to their plan participation based on factors such as health status, medical conditions, or claims experience. *See* ERISA Section 702(a), 29 U.S.C. §1182 (a). In response to concerns from employers that their wellness programs could be deemed to violate these HIPAA nondiscrimination standards, the Department of Labor, in 2006, issued final regulations under ERISA Section 702 specifically exempting wellness programs from the HIPAA nondiscrimination rules if they met certain requirements.

incentives and buil[t] on existing wellness program policies to promote employer wellness programs and encourage opportunities to support healthier workforces."[18] Relevant here, Congress eliminated any confusion as to the permissible incentive limits for such programs, by *codifying them* within the PHSA:

> **(A) The reward for the wellness program, together with the reward for other wellness programs with respect to the plan that requires satisfaction of a standard related to a health status factor, shall not exceed 30 percent of the cost of employee-only coverage under the plan. If, in addition to employees or individuals, any class of dependents (such as spouses or spouses and dependent children) may participate fully in the wellness program, such reward shall not exceed 30 percent of the cost of the coverage in which an employee or individual and any dependents are enrolled.** For purposes of this paragraph, the cost of coverage shall be determined based on the total amount of employer and employee contributions for the benefit package under which the employee is (or the employee and any dependents are) receiving coverage. **A reward may be in the form of a discount or rebate of a premium or contribution**, a waiver of all or part of a cost-sharing mechanism (such as deductibles, copayments, or coinsurance), **the absence of a surcharge**, or the value of a benefit that would otherwise not be provided under the plan.

---

*See generally* Department of Labor Regulations, 29 C.F.R. §2590.702(f). Those wellness requirements, which previously included a reward limitation of 20% of the total cost of self-coverage (or, if any dependents could participate in the wellness program, the total cost of coverage in which an employee and any dependents are enrolled) for participation in wellness programs, were later adopted by Congress in the provisions of the ACA. Section 715, as added by P.L. 111-148, §1563(e) (incorporating by reference amendments to the HIPAA nondiscrimination rules made by ACA and set forth in the Public Health Service Act). In fact, Congress *codified* these requirements *and increased* the permissible incentive limits for outcome-based programs to 30%. 42 U.S.C. § 300gg-4(j)(3).

[18] The Affordable Care Act and Wellness Programs, Centers for Medicare & Medicaid Services, https://www.cms.gov/cciio/resources/fact-sheets-and-faqs/wellness11202012a.

42 U.S.C.§ 300gg-4. Similarly, Congress explicitly amended ERISA to state as follows with respect to premium contributions in relation to Wellness Programs:

> Nothing in paragraph (1) [related to varying premium contributions] shall be construed—
> …
> (B) **to prevent a group health plan, and a health insurance issuer offering group health insurance coverage, from establishing premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention.**

29 U.S.C. § 1182 (emphasis added).[19]

Thus, Congress made its intent clear: wellness programs are permissible for employers, and those employers offering them are permitted to establish premium discounts in return for adherence to these programs. Title I of the ADA expressly permits "voluntary" medical examinations as part of an employee health program (42 U.S.C. § 12112(d)(4)(B)), and the ACA reinforces that authorization by allowing incentives up to 30% of coverage cost. 42 U.S.C. § 300gg-4(j)(3)(A). These statutes are not in conflict; they must be harmonized. *See Morton v. Mancari*, 417 U.S. 535, 551 (1974).

> **C.    White Cap's Incentives for Participation in the Wellness Program Are Lawful, and Plaintiff's Attempts to Create an Ambiguity in the Statutory Text of the ADA Fail As a Matter of Law.**

---

[19] There is no minimum number of employees that must be employed by an employer to be subject to ERISA. Thus, it covers all employers who would be subject to the ADA's requirements. *See* 42 U.S.C. § 12111(5)(A) (defining "employer" as a person engaged in an industry affecting commerce who has 15 or more employees)

Plaintiff seeks to create an ambiguity in the word "voluntary" under the ADA to effectively nullify the ERISA and PHSA *statutorily permitted* incentives for wellness programs. In other words, Plaintiff asks the Court to: (1) adopt and defer to the underlying EEOC regulations defining "voluntary" under Title I of the ADA, and (2) find conflict between the EEOC's regulations and the Affordable Care Act. Plaintiff's argument both violates the canons of statutory construction and also asks the Court to violate the Supreme Court's dictates in *Loper Bright*.

      i.    *The Court Should Not Defer to Agency Interpretation When Determining the Meaning of "Voluntary."*

"Courts have always had an 'emphatic' duty 'to say what the law is.'" *Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018). Furthermore, "courts need not and ... may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright*, 603 U.S. at 413. This principle must be adhered to even when there are express delegations of authority to an agency, "which are simply a difference in degree, not kind, from implicit delegations based on a law's silence or ambiguity." *United States v. Bricker,* 135 F.4th 427, 440 (6th Cir. 2025) (citing *Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420 (6th Cir. 2024) (explaining the Court's role post-*Loper* when a statute expressly authorizes agency interpretation) and *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 588 (6th Cir. 2025) (explaining that even when the statute expressly delegates authority to an agency, "[t]hrough it all, we must decide for ourselves whether the law means what

the agency says") (citations omitted). "Perhaps most fundamentally…agencies have no special competence in resolving statutory ambiguities. Courts do." *Loper Bright,* 603 U.S. at 400-01.

Here, Congress did not delegate authority to the EEOC to *define* the ADA's general terms. Congress already defined those terms under Title I of the ADA that it believed required further definition. *See* 42 U.S.C. § 12111. Congress merely provided the EEOC with authority to issue regulations to "carry out" Title I of the ADA. *See* 42 U.S.C. § 12116. This stands in contrast to those statutes where Congress delegated authority to an agency to define the statute's general terms. *See, e.g., Pickens,* 133 F.4th at 588 (discussing post-*Loper* interpretation of agency deference with respect to the FLSA, where Congress permitted the Secretary [of Labor] to define terms regarding the white collar exemptions to the FLSA) (citing 29 U.S.C. § 213(a)(1)). As explained by the Sixth Circuit in *Pickens:*

> [N]ot all agency actions are alike. In some cases, a statute gives an agency no room at all to maneuver, leaving us with the responsibility to honor the statute's "single, best meaning," "fixed at the time of enactment," whether the agency has the same view or not. [*Loper Bright,* 592 U.S.] at 400 (quotation omitted). **But in other cases, a statute delegates authority to an agency <u>to define general terms in the statute.</u>** *Id.* at 394–95. Under those circumstances, we "respect the delegation" by "fixing the boundaries of the delegated authority" based on our independent view of the statute and "ensuring that the agency acts within" those boundaries. *Id.* at 395 (quotation omitted).

*Id.* (emphasis added and citations clarified). Given that no such authority was provided by Congress to the EEOC to define the general terms of the ADA, there

was no express and clear conferral of authority to define the term "voluntary" under the statute. The Court must therefore interpret the statutory text of the ADA as written.

      *ii.*    *The Court Must Apply the Rules of Statutory Construction to Determine the Meaning of "Voluntary."*

Accordingly, the Court must use general canons of statutory interpretation when determining the meaning of "voluntary" in the context of medical examinations under the ADA. First, a court must analyze the statutory text. *United States v. Hill*, 963 F.3d 528, 532 (6th Cir. 2020). When a statutory term is undefined, courts give it the "ordinary meaning." *United States v. Small*, 988 F.3d 241 (6th Cir. 2021). To determine the meaning of a statutory word, "dictionaries are a good place to start." *United States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013). [1] The relevant definition is the one that was in use on the date of the enactment of the statute under consideration. *In re Weatherspoon*, 605 B.R. 472, 484 (Bankr. S.D. Ohio 2019) (citing *Volz v. Volz*, 167 Ohio St. 141, 146 N.E.2d 734, 738 (1957)). Three separate definitions of "voluntary[20]" from Black's Law Dictionary in 1990[21] are instructive:

---

[20] The first definition of "Unconstrained by interference; unimpelled by another's influence; spontaneous; acting of oneself" was analyzed in the context of whether a confession in a criminal matter was obtained "voluntarily" or through coercion, and is less pertinent to the instant matter. *See Coker v. State*, 33 S.E.2d 171, 174. Similarly, the last two definitions, "without valuable consideration; gratuitous, as a *voluntary conveyance,*" and "having merely nominal consideration; as a *voluntary* deed," are specific to the context of property conveyances and are inapplicable here.
[21] The ADA was signed into law on July 26, 1990.

(1) done by design or intention, (2) proceeding from the free and unrestrained will of the person, (3) produced in or by an act of choice. VOLUNTARY, Black's Law Dictionary (6th ed. 1990). The applicable definitions revolve around an intentional choice. Similarly, the first definition of voluntary's antonym, "involuntary," is defined as "without the will or power of choice." INVOLUNTARY, Black's Law Dictionary (6th ed. 1990). Accordingly, if the Plaintiff had a choice to participate in the Annual Physical Screening, his decision to do so was voluntary. If the Plaintiff had no choice *but* to participate, then his participation was not voluntary.

Here, Plaintiff concedes that he chose not to participate in the Annual Physical Screening in both 2022 and 2023. SAC ¶ 55-61. There are no allegations that he was terminated, demoted, or denied health coverage for doing so. *See generally,* SAC (ECF No. 48). Indeed, Plaintiff concedes that even after electing not to participate in the Annual Physical Credit, he retained his employment and continued with his health care coverage under White Cap plans.[22] Simply put, Plaintiff had a *choice* both years, and he exercised that choice. Thus, under the ordinary meaning of the term, the Wellness Program's annual physicals were "voluntary," much in the same way that Plaintiff's participation in White Cap's health plans was "voluntary" from the outset. The Court's inquiry should end there.

But in the event the Court finds that the statutory term "voluntary" is unclear,

---

[22] *See Id.* at ¶¶ 53-59, 61, 65, 66, 68, *see also* SAC Exhibit A (ECF No. 48-1).

a review of legislative history is appropriate. *See Pittsburgh & Conneaut Dock Co. v. Dir., Off. of Workers' Comp. Programs,* 473 F.3d 253, 267 (6th Cir. 2007) ("Resorting to legislative history is only appropriate when the statutory language at issue is not clear."). As set forth above, the legislative history makes clear that Congress' concerns when determining whether a program was "voluntary" revolved around being denied health care coverage or employment opportunities. *See supra* at pp. 8-11. Plaintiff does not allege that he was terminated, demoted, or denied advancement opportunities, nor does he allege that he was denied insurance coverage for choosing not to participate in the Annual Physical Credit.[23] Indeed, when Plaintiff attempted to be *excused* from the Annual Physical Credit's requirements on religious grounds, White Cap attempted to accommodate him. SAC Exhibit A (ECF No. 48-1) ("Additionally, if you are requesting a religious accommodation, please complete the attached form…). Congress' intent that these examinations not be used to: (1) limit health insurance *eligibility,* or (2) prevent occupational advancement have been met. *See* H.R. REP. 101-485, 75 1990.

    iii.    *The Only Court to Have Analyzed This Issue According to Canons of Statutory Construction Found a Wellness Program with a 100% Premium Surcharge Voluntary.*

Furthermore, the only court to have analyzed the issue within the appropriate framework of statutory construction found that participation in a similar wellness

---

[23] SAC at ¶¶ 53-59, 61, 65, 66, 68, *see also* SAC Exhibit A (ECF No. 48-1).

program—albeit involving premium surcharges—was voluntary. *See EEOC v. Orion Energy Sys., Inc.,* 208 F. Supp. 3d 989, 1000-01 (E.D. Wis. 2016). In *Orion*, the EEOC argued that requiring employees to complete a health risk assessment or pay 100% of their health insurance premiums (over $400 a month)[24] imposed a substantial penalty, rendering the program coercive rather than voluntary. *Id.* at 1001. The EEOC maintained that such a significant financial burden effectively compelled participation, thereby violating the ADA's provisions against involuntary medical examinations and inquiries. *Id.*

The court rejected the EEOC's argument. The *Orion* court reasoned that, despite the financial implications, employees had a genuine choice: participate in the wellness program or pay the full premium:

> Instead, the EEOC argues even apart from its new regulation that the wellness program is involuntary because shifting 100 percent of the premium cost to an employee who opted out of a program is so substantial that Orion's offer to pay the health benefit premium in exchange for the employee's participation in the program is more than a mere incentive. But even a strong incentive is still no more than an incentive; it is not compulsion. Orion's wellness initiative is voluntary in the sense that it is optional. An employee is not required to participate

---

[24] The Annual Physical Credit discount in 2023 for Plaintiff's Low Deductible HST Plan was $62.84 biweekly. SAC at ¶ 59; 2023 Benefits Guide (ECF No. 73-3 at 14). Plaintiff's decision not to participate resulted in a premium contribution of $131.30. SAC ¶¶ 56, 59. In 2024, the Annual Physical Credit discount was $ 63.50, bi-weekly for Plaintiff's Anthem A Plan. 2024 Benefits Guide (ECF No. 73-4 at 14). Plaintiff's decision not to participate resulted in a premium contribution of $ 131.96. Both are less than one-third of the employee contribution at issue in *Orion*.  *See* footnote 27 for case law regarding the propriety of considering these documents on a Rule 12(c) motion.

16

> in the program and is instead given a choice: either elect to complete the HRA as part of the health program or pay the full amount of the health benefit premium. A corporation is not required to fully pay for an employee's health insurance—indeed, it is not required to provide health insurance at all—and it is not unlawful to give an employee a choice regarding her health benefits provided the choices are among lawful alternatives. There may be strong reasons to comply with an employer's wellness initiative, and the employee must balance the considerations in deciding whether to participate or not. But a "hard choice is not the same as no choice." *See United States v. Martinez–Salazar*, 528 U.S. 304, 315, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000).

*Orion Energy Sys., Inc*., 208 F. Supp. 3d at 1001. This reasoning applies equally to Plaintiff's decision not to participate in the Annual Physical Credit here. According to his pleadings, Mr. Lobdell had a choice: participate in the Annual Physical Credit and receive the Annual Physical Credit or decline to participate and forego the credit. Plaintiff chose the latter. While it may have been a difficult choice for Plaintiff, "a hard choice is not the same as no choice." *Id.* at 1001 (citing *Martinez*, 528 U.S. at 315).

If this Court is inclined to believe that *some* incentive level could ultimately transform the medical examination into one that it is involuntary, then the Court must interpret this statutory term (i.e. "voluntary")—not the trier of fact—and harmonize it with the later enacted, more specific statute governing the incentive levels—the ACA (amending ERISA and the PHSA). *In re Anheuser-Busch Beer Labeling Mktg. & Sales Practices Litig*., 644 Fed. Appx. 515 (6th Cir. 2016) (a "specific statute covering a particular subject area always controls over a statute

17

covering the same and other subjects in more general terms.'") (citing *Stoletz v. State,* 875 So.2d 572, 575 (Fla. 2004)).[25] To do otherwise would leave statutory interpretation at the whim of the jury, potentially creating inconsistent rulings as to the meaning of the term "voluntary." Statutory interpretation is within the province of the Court. *See Arangure,* 911 F.3d at 336 ("All too often, courts abdicate their duty [to say what the law is] by rushing to find statutes ambiguous, rather than performing a full interpretative analysis.") There are no allegations in the SAC that White Cap's incentive levels exceed the limits set under the more specific, later enacted statute—the ACA.[26] Nor has Plaintiff pointed to any specific statute—or

---

[25] Under the general-specific canon of statutory construction, "**a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.**" *McKenna v. Dillon Transportation, LLC,* 97 F.4th 471, 475–76 (6th Cir. 2024) (emphasis added); *United States v. Hunter,* 12 F.4th 555, 567 (6th Cir. 2021) (emphasis omitted) (quoting *Morton*, 417 U.S. at 550–51).

[26] The Medical Plan Pricing indicates that White Cap's Annual Physical Incentives never exceeded 20% of the total cost of coverage, well below the 30% threshold. ECF No. 73-2; Affidavit of Natalie Price at ¶ 8 (verifying Plan Pricing and incentive levels); *id.* at ¶ 7 (verifying Benefits Guide containing same plan pricing with incentive levels). These documents identifying the incentive levels and plan pricing are integral to Plaintiff's claims that White Cap's incentives, which are referred to throughout the SAC, were unlawful. Such documents may be referred to on motions to dismiss without converting the motion to one governed by Rule 56(c) when they are integral to a plaintiff's claims. *Nitz-Lentz v. Metro. Life Ins. Co.,* No. 1:24-CV-356, 2024 WL 4555413, at *2 (W.D. Mich. Oct. 10, 2024) (holding that a plaintiff cannot survive a motion to dismiss where her claims are contradicted by the plan documents); *Corey v. Sedgwick Claims Mgmt. Servs.,* 165 F. Supp. 3d 672, 677 (N.D. Ohio 2016) (citations omitted); *Mele v. Fed. Rsrv. Bank of New York,* 359 F.3d 251, 256 (3d Cir. 2004), as amended (Mar. 8, 2004) (considering personnel policies guide on motion to dismiss because it was integral to plaintiff's claims); *Anderson v. Life Ins. Co. of N. Am.*, No. 1:11-CV-02922-AT, 2012 WL 13055953, at *5 (N.D.

even regulation[27]—prohibiting incentives in connection with Wellness Program
participation. Accordingly, judgment should be entered against Plaintiff on his claim
that White Cap's Wellness Program incentives rendered the medical examinations
in connection with the Annual Physical Credit "involuntary."

### D. Plaintiff's Claims Regarding the Notice Also Fail.

Plaintiff also alleges that there were technical deficiencies with the Notice
provided to employees that rendered the program "involuntary." Plaintiff's theory
requires the Court to defer to agency interpretation of the term "voluntary," which
sets forth additional notice requirements far beyond the term's ordinary meaning.

---

Ga. July 5, 2012) (considering employee-facing plan document entitled "Your Guide
to Benefits" at motion to dismiss stage); *Bailey v. CIGNA Ins. Co.,* 87 Fed. App.
347, 348 (5th Cir. 2004) (considering Enrollment Guide and Summary Plan
Description on motion to dismiss); *Delker v. MasterCard Int'l, Inc.,* 21 F.4th 1019
(considering language of enrollment guide on motion to dismiss).A document is
"integral" to a complaint where the legal rights at issue in the complaint rely
"'heavily upon its terms and effect.' " *Moler v. Univ. of Maryland Med. Sys., No.*
1:21-CV-01824-JRR, 2022 WL 2716861, at *2 (D. Md. July 13, 2022) (citations
omitted) (striking extraneous documents but considering retirement enrollment
guides on motion to dismiss).These documents directly contradict Plaintiff's
allegations and demonstrate that dismissal is warranted.  But if the Court is not
inclined to consider these documents in determining whether dismissal is warranted,
the *absence* of any allegations that White Cap's incentive levels ran afoul of the
ACA in the SAC is sufficient for dismissal, and the documents can be disregarded.
[27] **There is no prohibition within the EEOC regulations limiting incentives
connected with Wellness Programs.** Indeed, *nothing* in the EEOC regulations'
definition of "voluntary" discusses incentive levels at all. *See* 29 C.F.R. §
1630.14(d)(2). **And these same regulations elsewhere refer to incentive levels in
connection with Wellness Programs _twice_.** *Id.* at § 1630.14(d)(4)(iv), (d)(5).

*See* 29 C.F.R. § 1630.14 (d)(2)(iv). As set forth above, deferring to the EEOC's attempt to define "voluntary" is improper here. But even if the Court were to defer to the EEOC regulations, Plaintiff's claims fail as a matter of law.

        i.    *Plaintiff's Allegations That White Cap's Wellness Program Required Participants to Waive Confidentiality Protections Are Conclusory and Baseless.*

At Paragraph No. 140, Plaintiff states as follows:

> "As a condition to receive the Annual Physical Credit, White Cap requires its employees to authorize the release of their medical information "to any third party" and further requires them to authorize "re-disclosure" of their information by any third party. Refusal to provide these authorizations disqualifies the employees from receiving the Annual Physical Credit. So does an employee's later revocation of these authorizations."

SAC at ¶ 140. The authorization explicitly referenced by Plaintiff states as follows:

**Protection of Your Health Information**: Premise Health agrees to abide by all applicable laws and regulations governing the privacy and security of your personal health information. To the extent Premise Health is subject to the Health Insurance Portability and Accountability Act and its implementing regulations ("HIPAA"), Premise Health will abide by HIPAA and maintain the privacy and security of your Protected Health Information ("PHI") in accordance with your employer's Notice of Privacy Practices ("Notice") and your employer's directive. You may request a copy of this Notice from your employer.

**Authorization**: I understand that my participation in the program is strictly voluntary, and in order to determine my eligibility for follow-up, the administrator(s) of the health and wellness program must receive a record of my participation. By signing below, I authorize Premise Health will disclose information regarding my participation in the program with the administrator(s) of the program. If the program includes by design a review of my results (e.g., measurement, test or blood specimen results) so that I can be provided recommendations in furtherance of my health, I authorize Premise Health to disclose my results to any third party who has contracted with my employer to review and analyze those results in connection with the program. I understand that no information obtained or created as a result of my participation in this program will be used to make any employment decision about me.

I understand that this information may be disclosed through electronic means unless some other method of disclosure is specified in this authorization. I also understand that the information disclosed pursuant to this authorization may be subject to re-disclosure by the recipient and may no longer be protected by federal or state privacy laws.

ECF No. 73-5.[28] Accordingly, the authorization does not permit disclosure of

---

[28] These authorizations were applicable to the program as administered by eHealth Screenings from years 2022 through 2024 during Plaintiff's employment. eHealth Screenings' authorization language was nearly identical each year. *See* ECF No. 73-

medical information to "any third party," and instead only permits disclosure to third parties "who [have] contracted with my employer to review and analyze those results in connection with the program." *Id.* To the extent the Court intends to defer to the EEOC regulations' definition of "voluntary" under the ADA, the authorization comports with these requirements as it *describes* the restrictions on the disclosure of the employee's medical information and *describes* other parties with whom information will be shared. *See* 29 CFR 1630.14 (d)(2)(iv)(C); *see also [SPD]*

The authorization also does not require employees to "authorize 're-disclosure' of their information by any third party." SAC at ¶ 140. The authorization's language stating that "information disclosed pursuant to this authorization may be subject to re-disclosure" and that the signing party has a right to revocation, are *required* disclosures pursuant to HIPAA regulations. *See* 45 C.F.R. § 164.508 (c)(2)(i) and (iii) (requiring that authorizations provide a right to revocation and state the potential for information to be redisclosed by a recipient, respectively). Thus, Plaintiff cannot complain that the Notice's inclusion of these required HIPAA disclosure statements somehow violates the EEOC's regulations concerning "voluntary medical examinations." As stated elsewhere in the authorization, eHealth Screenings acknowledged its obligations to "abide by all

---

5. This authorization is explicitly referenced in Plaintiff's SAC and integral to his claims, and is properly considered on this Rule 12(c) motion. *See* footnote 27, *supra.*

applicable laws and regulations governing the privacy and security of [Plaintiff's] personal health information" and "abide by HIPAA and maintain the privacy and security of [Plaintiff's] Protected Health Information" in accordance with White Cap's directives. ECF No. 73-5. Accordingly, even assuming the Court were to adopt the EEOC regulation's definition of "voluntary," and require notice to employees as outlined at 29 C.F.R. § 1630.14 (d)(2)(iv), White Cap's Notice complies and Plaintiff fails to state a claim.

> ii. *To the Extent There Were Any Technical Deficiencies in the Notice, White Cap Substantially Complied with the EEOC Regulations.*

Even if any technical deficiencies in the Notice had been identified, the Court should evaluate whether the Notice, on its face, is in "substantial compliance" with the EEOC regulation. The EEOC's notice requirement is more akin to notices provided by ERISA plan administrators when claimants are denied plan benefits, or when a plan administrator is required to provide a COBRA notice to plan participants upon the occurrence of a qualifying event. *See Moore,* 458 F.3d at 436 (6th Cir. 2006) (applying "substantial compliance" doctrine for ERISA plan administrator's notification that a participant was denied a plan benefit); *Lacy v. Fulbright & Jaworski,* 405 F.3d 254, 256 (5th Cir. 2005) (same). *Martin v. Feeny Chrysler-Dodge of Gaylord, Inc.,* No. 09-12513-BC, 2010 WL 3623206, at *3 (E.D. Mich. Sept. 15, 2010) (discussing potential for substantial compliance doctrine to

apply to COBRA notice). In the ERISA context, the substantial compliance standard looks at "all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances." *Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 436 (6th Cir. 2006).

Here, the Notice provided sufficient information to allow Plaintiff to determine whether he wanted to participate in the Wellness Program. To the extent there was any ambiguity in the Notice itself, Plaintiff has attached to his SAC his December 2023 communications with White Cap's human resource representative regarding the Annual Physical Credit requirements, which read, in pertinent part:

> Who or what companies ends up with my private, biometric data? eHealth Screenings houses the data and does not share personal medical data with White Cap. Quantum Health assists Anthem and HST plan members with claims issues and also provides clinical support for associates and covered dependents. For that reason, they have access to medical claims and biometric data. Quantum and eHealth Screenings maintain strict confidentiality with this data and adhere to the highest standards of data security.

ECF No. 48-1. Accordingly, Plaintiff was provided sufficient and adequate notice of the Annual Physical Credit's requirements.

### iii.    *Plaintiff Has Not Suffered Any Prejudice or Concrete Harm Due to a Purported Deficiency in the Notice.*

Plaintiff has not and cannot allege that he suffered any prejudice from any purported technical deficiency in the Notice, nor has he suffered any concrete harm as it related to the EEOC's purported notice requirement. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 434-439 (2021) (Article III requires that Plaintiff suffer a

concrete injury even in the context of a statutory violation, and a "risk of future harm" that has not materialized cannot be the basis for a suit in damages). Plaintiff averred in the SAC that he never participated in a medical examination in connection with the Annual Physical Credit. Plaintiff never signed the Notice, never participated in an Annual Physical Screening, and never had his screening results transmitted to a third party. Thus, he could never have "waived" his privacy rights to his screening results as he claims.

Plaintiff appears to argue there is some risk of future harm *if he were to participate* in the Annual Physical Credit due to the Notice's purported deficiencies, but without more, this does not constitute a concrete harm in a suit for damages. *Id.* at 434-439. Thus, Plaintiff does not have Article III standing to pursue any claims for damages based on technical deficiencies in the Notice itself. To the extent Plaintiff purports to represent a class of individuals who may have received a purportedly deficient Notice, signed said Notice, transmitted their medical information pursuant to said Notice, and now seek monetary damages as a result, Plaintiff (as a named class representative) "cannot predicate standing on injury which he does not share [with the putative class]." *Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002).

## CONCLUSION

For the foregoing reasons, White Cap respectfully requests that judgment be entered on the pleadings in favor of Defendants and against Plaintiff. To the extent the Court defers to the EEOC's definition of "voluntary" and finds that there was a technical deficiency in the Notice provided to employees in connection with the Annual Physical Credit, Defendants request that the Court enter judgment in favor of Defendants and against Plaintiff with respect to any claim for monetary damages.

Respectfully submitted this 20th day of June, 2025.

Respectfully submitted,
**FORDHARRISON, LLP**
*By: /s/ Nicholas S. Andrews*
Kimberly A. Ross (P84382)
180 N. Stetson Avenue, Suite 1660
Chicago, IL 60601
kross@fordharrison.com
Nicholas S. Andrews
401 E. Jackson Street, Suite 2500
Tampa, FL 33602
nandrews@fordharrison.com
Attorneys for Defendants White Cap Management, LLP

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 20, 2025, I filed a true and correct copy of the foregoing with the Clerk of Court via CM/ECF which will send a copy via e-mail to all counsel of record.

*/s/ Nicholas S. Andrews*
Attorney