UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW LOBDELL,

                Plaintiff,

v.

WHITE CAP, LP, WHITE CAP
SUPPLY HOLDINGS, LLC, WHITE
CAP MANAGEMENT, LLC,

                Defendants.

_____/

Civil Action No. 24-11450

Nancy G. Edmunds
United States District Judge

David R. Grand
United States Magistrate Judge

## REPORT AND RECOMMENDATION TO DENY DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (ECF No. 89)

Plaintiff Matthew Lobdell ("Lobdell") brings this civil action against his former employer for violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). He names as defendants White Cap Supply Holdings, LLC, White Cap Management, LLC, and White Cap, L.P. (collectively, "White Cap").

Before the Court is White Cap's Motion for Judgment on the Pleadings. (ECF No. 89). Lobdell responded to the motion (ECF No. 90) and White Cap replied (ECF No. 111). On October 22, 2025, the Court held oral argument on the motion.

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that White Cap's Motion for Judgment on the Pleadings **(ECF No. 89)** be **DENIED.**

## II.    REPORT

### A.    Background

White Cap runs a self-funded health benefits ("insurance") plan for its employees. (ECF No. 48, PageID.1629). Employees who enroll in the insurance plan pay a premium, which is deducted from their paycheck. (*Id.*; ECF No. 89, PageID.3318). Employees can receive a discount on their premiums, called an Annual Physical Credit, by participating in White Cap's Health Screen Program (the "Program"). (ECF No. 48, PageID.1630). The Health Screen Program requires that participants receive medical exams and biometric testing. (*Id.*, PageID.1629). If the screening results in a diagnosis of a chronic condition, then the employee, and a spouse if also enrolled, must participate in White Cap's Chronic Condition Management Program ("CCMP") to receive the Annual Physical Credit. (*Id.*, PageID.1630). The CCMP requires that participants adhere to a treatment plan. (*Id.*, PageID.1647). Even employees who do not participate in the Health Screen Program may qualify for participation in the CCMP, although they won't receive the discount on their premiums unless they also complete testing to comply with the requirements of the Health Screen Program.

White Cap uses third parties to administer the Health Screen Program. Prior to 2022, Humana Insurance Company ("Humana") was the administrator of White Cap's wellness Program. (ECF No. 82, PageID.3154). Since then, eHealthScreenings ("eHealth") has been the wellness Program's administrator. (ECF No. 59, PageID.2339). When signing up for the Health Screen Program, employees sign a notice and authorization form that tells them their data will be shared with third parties to execute the Program. White Cap receives information on who has successfully completed the Health Screen Program and whether required employees have completed the CCMP, so it knows how

much to deduct from the employee's paycheck.  (ECF No. 48, PageID.1648).

In 2020, Lobdell began working as a Licensed Commercial Driver for CSI Geoturf. (ECF No. 48, PageID.1628).  In 2022, White Cap acquired CSI Geoturf and transitioned Lobdell to its insurance plan.  (*Id.*, PageID.1629).  As a new employee, Lobdell automatically received the Annual Physical Credit for the remainder of the first calendar year in which he enrolled in the insurance plan.  (*Id.*, PageID.1649).  Therefore, for the first year of his enrollment, White Cap deducted $68.46 from each of Lobdell's bi-weekly paychecks to pay for his insurance premium.  (*Id.*, PageID.1629).  White Cap told Lobdell that the following year, unless he completed medical exams and biometric testing as part of White Cap's Health Screen Program, he would have an additional $41.94 to $63.50 deducted per paycheck for the cost of his premium.  (*Id.*, PageID.1631-32).

In 2022 and 2023, Lobdell refused to participate in the Health Screen Program. (ECF No. 48, PageID.1633-34).  As a result, White Cap deducted about $63 more from each of his paychecks than it had during his first year of employment, or a total of about $131 per paycheck.[1]  (*Id.*).

Lobdell alleges that White Cap's Health Screen Program violates the ADA in two ways. First, he argues that White Cap forces employees to participate in the wellness Program, which violates the ADA provisions that say employers may only offer 'voluntary' wellness programs.  (*E.g.*, ECF No. 48, PageID.1623, 1646, 1650, 1646).  Specifically, these provisions provide, "(A) . . . A covered entity shall not require a medical examination

---

[1] In 2022, White Cap deducted $131.30 from his paycheck for the cost of the insurance premium and in 2023, White Cap deducted $131.96.  (ECF No. 48, PageID.1633-34).

and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity," and "(B) . . . A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(A), (B).  He supports this claim by arguing that a) the Annual Physical Health Credit is a punishment that forces employees to participate, and b) the Program does not adequately inform employees as to what medical data will be shared and with whom, as required by 'voluntary' programs according to the ADA.

Second, Lobdell argues that White Cap requires participating employees to consent to the release of their confidential medical information in violation of the ADA's confidentiality requirements for employer-run wellness programs.  29 C.F.R. § 1630.14). (ECF No. 48, PageID.1623, 1648-49).

### B.  Standard of Review

Pursuant to Fed. R. Civ. P. 12(c), "a party may move for judgment on the pleadings." Such a motion is reviewed under the same standard as motions to dismiss under Fed. R. Civ. P. 12(b)(6).  *See Vickers v. Fairfield Medical Center,* 453 F.3d 757, 761 (6th Cir. 2006).  Therefore, on a motion brought pursuant to Rule 12(c), judgment may be issued for a party's failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6) and (c).

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests a complaint's legal sufficiency. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556. Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

In deciding whether a plaintiff has set forth a "plausible" claim, the Court must accept the factual allegations in the complaint as true. *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That tenet, however, "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," to prevent a complaint from being dismissed on grounds that it fails to comport sufficiently with basic pleading requirements. *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555; *Howard v. City of Girard, Ohio*, 346 F. App'x 49, 51 (6th Cir. 2009). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### C.    Analysis

#### 1.    *Claims Based on whether White Cap's Health Screen Program is 'Voluntary' under the ADA*

##### a.    *Lower premiums for participating employees*

The ADA prohibits employers from requiring medical examinations or making disability-related inquiries of their employees, unless it is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).  But employers may offer "voluntary medical examinations, including voluntary medical histories, which are part of an employee health program…." 42 U.S.C.A. § 12112(d)(4)(B).  White Cap claims its Health Screen Program is voluntary as a matter of law under the ADA because the Program's premium discount is a permissible incentive.

The EEOC defines voluntary programs as those where the employer:

(i)    Does not require employees to participate;
(ii)   Does not deny coverage under any of its group health plans…;
(iii)  Does not take any adverse employment action or retaliate against…;
(iv)   Provides employees with a notice that:

> (A) Is written so that the employee from whom medical information is being obtained is reasonably likely to understand it;
>
> (B) Describes the type of medical information that will be obtained and the specific purposes for which the medical information will be used; and
>
> (C) Describes the restrictions on the disclosure of the employee's medical information, the employer representatives or other parties with whom the information will be shared, and the methods that the covered entity will use to ensure that medical information is not improperly disclosed (including whether it complies with the measures set forth in the HIPAA regulations

6

codified at 45 CFR parts 160 and 164).

29 C.F.R. § 1630.14(2).

Additionally, in 2017, EEOC regulations allowed employers to offer incentives up to 30% of the cost of self-only coverage for employee participation in voluntary programs, but the United States District Court for the District of Columbia vacated that rule after finding the EEOC failed to adequately explain its decision.  *AARP v. United States Equal Emp. Opportunity Comm'n*, 292 F.Supp.3d 238, 238 (D.D.C. 2017).  Today, however, the EEOC no longer has a regulation regarding incentives, such as the premium deductions in this case.  Two cases have dealt differently with the issue of whether incentives violate the ADA's 'voluntary' requirement.  First, before the EEOC's 30% incentive limit took effect, the United States District Court for the Eastern District of Wisconsin ruled that an employee's participation in a wellness program is 'voluntary' even if the employer pays 100% of the premium for employees who participate.  *Equal Emp. Opportunity Comm'n v. Orion Energy Sys. Inc.,* 208 F. Supp. 3d (E.D. Wis. 2016).  The *Orion* court held that no incentive could render a program involuntary under the ADA, because "even a strong incentive is still no more than an incentive; it is not compulsion," and "a 'hard choice' is not the same as no choice.'" *Orion*, 208, F. Supp.3d at 1001.

Second, after the EEOC had vacated the 30% incentive limit, the United States District Court for the Northern District of Illinois ruled that whether a $50 monthly paycheck deduction for failure to participate in a wellness program rendered the program involuntary was a question of fact.  *Williams v. City of Chicago*, 616 F. Supp. 3d 808, 817 (N.D. Ill. 2022).  Specifically, the *Williams* court reasoned,

7

> Plaintiffs allege that the Wellness Program is involuntary because the City made a $50 payroll deduction for each month that an employee or covered spouse did not participate. [] By contrast, the City argues that the Wellness Program is voluntary, as the inclusion of a "financial incentive" does not render the program involuntary. . . . The issue of whether the Wellness Program is voluntary is a question of fact. In a motion to dismiss under 12(b)(6), the Court 'accept[s] well-pleaded facts as true.' [] Plaintiffs have alleged that their participation in the Wellness Program was not voluntary. [] Taking these allegations as true and making all reasonable inferences in favor of Plaintiffs… Plaintiffs have sufficiently alleged that the Program was not voluntary.

*Williams*, 616 F. Supp 3d at 817 (internal citations omitted). For several reasons, the Court respectfully follows the approach taken in *Williams*.

First, White Cap essentially asks the Court to adopt an interpretation of 'voluntary' that would not only allow *its* incentive program, but *any* incentive program. The Court declines to go this far. Whether the Program was compulsive to Lobdell or to a class of employees is a question of fact. *Id.* White Cap argues that the legislative history of the ADA indicates that the only requirement for voluntary programs is that employees are not "terminated, demoted, or denied health coverage" for not participating. (ECF No. 89, PageID.3330). It references committee reports written from the ADA's drafting where committee members expressed concern that employers would take adverse employment actions against employees who didn't participate in the wellness program. (*Id.*, PageID.3323-24). Since the members didn't mention any concerns about incentives, White Cap suggests that these members believed that incentives should be allowed. Similarly, White Cap argues that Congress's choice not to prohibit incentives in the ADA was an endorsement of their use. (*Id.*, PageID.3322). But instead of specifically restricting or

permitting the use of incentives, Congress used the word 'voluntary' to define the outer limits of permissible wellness programs.  Therefore, 'voluntary' is the relevant standard and term that the Court must now interpret.[2]  The legislative history does not override the ADA's text, which requires the Court to evaluate whether a wellness program is "voluntary."

Next, White Cap argues that the ADA permits its use of incentives because the ordinary meaning of voluntary is that there was "an intentional choice," and its employees were not required to participate.[3]  (ECF No. 89, PageID.3330).  It argues that all choices are voluntary, and employees make a choice when they opt-in to a wellness program, even if incentives are driving their decision.  (*Id.*, PageID.3330) ("[I]f the Plaintiff had a choice to participate in the Annual Physical Screening, his decision to do so was voluntary.").  But the question of whether someone has a choice, or is being forced into a decision, is the question at the heart of the word 'voluntary.'  If no amount of pressure could render a conscious action involuntary, the word 'voluntary' would have no meaning in the ADA. Indeed, White Cap seems to recognize as much, as it notes that "[t]here are no allegations

---

[2] Although the Court is not bound by the EEOC's definition of voluntary, it is instructive that the EEOC saw Congress's inclusion of the word "voluntary" as its own requirement, not a placeholder for a restriction on adverse employment actions.  Accordingly, in its regulations on the definition of "voluntary," the EEOC not only accounted for the committees' concerns by including explicit limits on adverse employment actions, but also put into place more general restrictions for defining voluntary wellness programs.

[3] White Cap cites a handful of definitions from Black's Law Dictionary, including "(1) done by design or intention, (2) proceeding from the free and unrestrained will of the person, (3) produced in or by an act of choice."  (ECF No. 89, PageID.3330).  These definitions rely on one's understanding of intention, free will, and choice, and rather than clarifying what Congress meant by the word 'voluntary,' they merely beg the question.

that [Lobdell] was terminated, demoted, or denied health care coverage" for not participating in the Program. (ECF No. 89, PageID.3330). While perhaps true, Lobdell alleges a different form coercion, that he faced a financial penalty for not participating in the Program. At this stage of the case, it would be inappropriate for the Court to draw a line between a demotion, for instance, and the financial penalty alleged by Lobdell. Rather, at least for purposes of resolving White Cap's present motion for judgment on the pleadings, it is sufficient to say that because Congress chose the word 'voluntary' rather than limiting employer-run wellness programs to specific adverse employment actions, Lobdell plausibly alleges that a program may be involuntary even if it doesn't use adverse employment actions for coercion. Put simply, it is a question of fact whether White Cap's use of incentives, or, as Lobdell characterizes them, penalties, renders its Program involuntary.

If the Court will not accept that all incentives are permissible in a voluntary wellness program, White Cap urges the Court to find, as a matter of law, that providing incentives up to 30% of the cost of coverage does not render a program involuntary, since the Affordable Care Act ("ACA") allows insurers to offer incentives up to 30%.[4] 26 C.F.R. § 54.9802-1. Under that interpretation, White Cap argues its Program is voluntary since it offers only a 20% reduction in the cost of premiums for participation. (ECF No. 89, PageID.3334, n. 25).

---

[4] As stated previously, the EEOC had adopted this 30% incentive limit in 2016, but the District Court in *AARP* vacated the rule because the EEOC had failed to adequately explain its decision to adopt the 30% incentive limit. *AARP v. United States Equal Emp. Opportunity Comm'n*, 292 F.Supp.3d 238, 238 (D.D.C. 2017).

The Court declines to adopt the ACA's 30% guideline as the limit under the ADA as urged by White Cap.  As the District Court in *AARP* discussed, the two statutes are meaningfully different.  First, the ADA applies primarily to employers and the ACA to insurers.  Accordingly, the ACA was enacted to prevent insurance discrimination, not discrimination by employers.  Second, the word 'voluntary' is not in the salient ACA provisions.  Given that the ADA is addressed at different actors and written with different requirements than the ACA, the Court will not adopt an approach that would essentially read the word 'voluntary' out of the ADA.  Second, as the District Court noted in *AARP*, there are other reasons not to adopt the 30% rule in the ADA setting.  For example, the District Court pointed to a comment from the EEOC's rulemaking process that "based on the average annual cost of premiums in 2014, a 30% penalty for refusing to provide protected information would double the cost of health insurance for most employees." *AARP*, 167 F.Supp.3d at 32.  The District Court also pointed to the disproportionate impacts on lower-income workers, who will feel much greater pressure at any percentage level to capitulate.  *Id*.  Employers are in a different position in relation to their employees than insurers are to their insureds, which is reflected by the different statutes that apply to employers as opposed to insurers.  For all of these reasons, the Court will not adopt the ACA's 30% limit on incentives for wellness programs under the ADA as a matter of law.[5]

Finally, the Court finds there is a question of fact as to whether White Cap's

---

[5] While the foregoing is reason enough not to adopt the approach urged by White Cap, the Court notes that even if it were to adopt the 30% guideline, at least on the present record, a question of fact would exist as to whether White Cap's incentive falls below that threshold.

"incentive" is actually a penalty, which could impact whether the Program was voluntary or not.  White Cap has characterized its incentive as a discount on the full cost of the premium for employees who participate in the Health Screen Program.  Most discounts begin by presenting the customer with the full price and then offering a reduced price for compliance.  But, at least according to Lobdell's allegations, White Cap began by charging employees the discounted price and *later* told them "they would 'lose' their Annual Physical Credits," which would increase their premium, if they didn't comply.  (ECF No. 48, PageID.1632).  This process is one reason that Lobdell alleges that the Health Screen Program is not an incentive program at all, but a penalty for failure to participate.  (ECF No. 48, PageID.1645) ("Employees that do not agree to submit to such Medical Examinations are financially penalized.").  The issue is not just semantics; how the process was actually framed for White Cap's employees is relevant to the amount of coercion, if any, placed upon them to participate.  That impacts whether White Cap operated its wellness Program using incentives or penalties, and ultimately, whether White Cap's wellness Program was voluntary.

For all of these reasons, White Cap has not shown that it is entitled to a judgment on the pleadings based on its argument that its Health Screen Program is voluntary and that the Program's premium discount is a permissible incentive as a matter of law under the ADA.

        *b.*    *EEOC's notice requirement*

As part of its requirements for voluntary wellness programs, the EEOC requires that employers provide employees with a written notice about what type of medical information

12

is being collected and with whom it is being shared.   29 C.F.R. § 1630.14(2)(iv).

Specifically, employers must provide employees with a notice that:

> (A) Is written so that the employee from whom medical information is being obtained is reasonably likely to understand it;
>
> (B) Describes the type of medical information that will be obtained and the specific purposes for which the medical information will be used; and
>
> (C) Describes the restrictions on the disclosure of the employee's medical information, the employer representatives or other parties with whom the information will be shared, and the methods that the covered entity will use to ensure that medical information is not improperly disclosed (including whether it complies with the measures set forth in the HIPAA regulations codified at 45 CFR parts 160 and 164).

29 C.F.R. § 1630.14(2)(iv).

White Cap's Program administrator, eHealth, provides the following notice to White Cap employees:

> Protection of Your Health Information: Premise Health agrees to abide by all applicable laws and regulations governing the privacy and security of your personal health in formation. To the extent Premise Health is subject to the Health Insurance Portability and Accountability Act and its implementing regulations ("HIPAA"), Premise Health will abide by HIPAA and maintain the privacy and security of your Protected Health Information ("PHI") in accordance with your employer's Notice of Privacy Practices ("Notice") and your employer's directive. You may request a copy of this Notice from your employer.
>
> Authorization: I understand that my participation in the program is strictly voluntary, and in order to determine my eligibility for follow up, the administrator(s) of the health and wellness program must receive a record of my participation. By signing below, I authorize Premise Health will [sic] disclose information regarding my participation in the program with the administrator(s) of the program. If the program includes by design a review of my results (e.g., measurement, test or blood specimen results) so that I can be provided

recommendations in furtherance of my health, I authorize Premise Health to disclose my results to any third party who has contracted with my employer to review and analyze those results in connection with the program. I understand that no information obtained or created as a result of my participation in this program will be used to make any employment decision about me.

I understand that this information may be disclosed through electronic means unless some other method of disclosure is specified in this authorization. I also understand that the information disclosed pursuant to this authorization may be subject to re-disclosure by the recipient and may no longer be protected by federal or state privacy laws.

(ECF No. 73-5, PageID.2794) (the "Notice").

White Cap argues that this Notice meets the requirements set out by the ADA because it "*describes* the restrictions on the disclosure of the employee's medical information and *describes* other parties with whom information will be shared." (ECF No. 89, PageID.3337) (emphasis in original).[6]  But Lobdell states a plausible claim that the Notice fails to adequately inform participants what *type of data* is collected and *who* will receive it.

First, the Notice only provides the following warning that even arguably touches on the subject of what medical information will be collected: "If the program includes by design a review of my results (e.g., measurement, test or blood specimen results) ... I

---

[6] White Cap also argues that, "[a]s a threshold matter, *this notice requirement* stems from the EEOC's attempt to define 'voluntary' in its Title I regulations. But Congress did not grant authority to the EEOC to redefine the ADA's ordinary terms. Pursuant to *Loper Bright [],* the Court should apply the ordinary meaning of the term 'voluntary,' which forecloses any further analysis regarding the Notice." (ECF No. 89, PageID.3319) (emphasis added).  In other words, White Cap suggests that the Court can ignore the notice requirement altogether.  But, as above, White Cap's approach is premised on an unreasonably myopic interpretation of the term 'voluntary.'  Indeed, the Court finds that meaningful notice is a logical requirement for a voluntary program, since employees can't 'voluntarily' agree to something if they don't know *what* they're agreeing to.

authorize Premise Health to disclose my results…" (ECF No. 73-5, PageID.2794). This hardly makes clear to each participant what medical data and information – whether provided by the employee or collected pursuant to the Program – will be shared.

Second, Lobdell plausibly claims that White Cap fails to provide notice to employees regarding *who* will receive their medical data and information. White Cap asserts that the Notice describes the parties that will receive the information, noting that the Notice limits disclosure to "any third party who has contracted with my employer to review and analyze those results in connection with the program." (*Id.*, PageID.3337). But, contrary to White Cap's assertion that there are "no allegations in the SAC that White Cap was provided with individualized medical results in connection with its Wellness Program," Lobdell alleges in his complaint that "[i]f [an] employee fails, refuses, or does not adhere to the requirements of the Chronic Condition Management Program, White Cap is informed of that . . . In other words . . . White Cap . . . learns the identity of individuals identified as having a chronic condition, or disability (through failed adherence to the Chronic Condition Management Program)." (ECF No. 48, PageID.1648).[7] Thus, Lobdell's position is that the Notice does not accurately describe the entities to whom at least some employees' medical data and information will be shared, and Lobdell plausibly alleges that the Notice does not make clear that *White Cap* itself will receive notification that certain employees have a "chronic condition" or "disability." Indeed, a reasonable

---

[7] Construed as such, this plausibly alleges a violation of 42 U.S.C. § 12112(d)(4)(A), which prohibits an employer from inquiring "whether such employee is an individual with a disability . . . unless such [] inquiry is shown to be job-related and consistent with business necessity."

interpretation of White Cap's notice provision is that such information would *not* be transmitted to White Cap itself, but rather would only be transmitted to "any ***third party*** who has contracted with [White Cap] . . ." (ECF No. 73-5, PageID.2794) (emphasis added).

Finally, White Cap argues that the Notice should be held to a "substantial compliance" standard. (ECF No. 24-11450). In support of that argument, White Cap cites to cases arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), which allowed plan administrators to give "substantial notice" to participants that their benefits were being denied. (ECF No. 89, PageID.3339) (citing *Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 436 (6th Cir. 2006); *Lacy v. Fulbright & Jaworski,* 405 F.3d 254, 256 (5th Cir. 2005); *Martin v. Feeny Chrysler-Dodge of Gaylord, Inc.,* No. 09-12513-BC, 2010 WL 3623206, at *3 (E.D. Mich. Sept. 15, 2010)). Those cases, however, do not support White Cap's argument here because they arose in ERISA cases which do not share a legal or factual parallel to the present case. White Cap does not identify a single case where the "substantial compliance" standard was applied to the type of notice provision at issue in this case. Moreover, here, the notice requirement relates to concerns over confidentiality and the sharing of employees' own medical data and information, which seems materially different than the type of information at issue in the ERISA cases – the mere fact that a plan participant had been denied benefits. Therefore, at least at this stage of the case, the Court declines to apply the substantial compliance standard urged by White Cap.

### 2.    *Confidentiality Requirements*

Lobdell also challenges White Cap's compliance with the confidentiality requirements in 29 C.F.R. § 1630.14, which generally require a voluntary employer-run wellness program to maintain the confidentiality of its employees' health data. The regulation lays out multiple requirements related to confidentiality, but Lobdell's main contention seems to be that White Cap violated the following provision:

> (iv) A covered entity shall not require an employee to agree to the sale, exchange, sharing, transfer, or other disclosure of medical information (except to the extent permitted by this part to carry out specific activities related to the wellness program), or to **waive any confidentiality protections** in this part **as a condition for participating in a wellness program or for earning any incentive** the covered entity offers in connection with such a program.

29 C.F.R. § 1630.14(d)(4)(iv) (emphasis added).

Lobdell alleges that White Cap violates this regulation in a few ways. For instance, Lobdell argues that, through the "Authorization" provision in its Notice, *see supra* at 13-14, White Cap "require[es] employees to waive the confidentiality of their protected health information as a prerequisite to receiving an Annual Physical Credit . . ." (ECF No. 48, PageID.1645). He also alleges White Cap violates the regulation because "[e]mployees that do not authorize the release of their medical results to White Cap, or other unidentified third-parties, are prohibited from receiving an Annual Physical Credit and financially penalized." (*Id.*).

White Cap makes two counter arguments. First, it argues that the Authorization provision in its Notice doesn't violate the regulation because "the authorization does not permit disclosure of medical information to 'any third party,' and instead only permits

17

disclosure to third parties 'who [have] contracted with [White Cap] to review and analyze [the employee's] results in connection with the program.'"  (ECF No. 89, PageID.3337). Second, White Cap argues that the Authorization verbiage does not run afoul of the regulation because it "does not require employees to 'authorize 're-disclosure' of their information by any third party,'" states that "information disclosed pursuant to this authorization may be subject to re-disclosure," and provides that the signing party has a right to revocation, all of which "are *required* disclosures pursuant to HIPAA regulations." (*Id.*) (emphasis in original) (citing 45 C.F.R. § 164.508 (c)(2)(i) and (iii)).

White Cap's arguments may be sound in some respects, as it is fair to say that merely sharing the participants' medical information with the Program administrator and having HIPAA-required verbiage falls within the regulation's safe harbor provision that permits disclosure "to the extent permitted by this part to carry out specific activities related to the wellness program."  29 C.F.R. § 1630.14(d)(4)(iv).  But, White Cap's arguments don't address at least one of the fundamental concerns raised by Lobdell – that some of the employees who are required to sign the Authorization receive a "chronic condition" designation, with White Cap ultimately learning they have a "chronic condition" or "disability."  *See supra* at 14-16. (ECF No. 48, PageID.1648).  Such disclosure arguably exceeds the regulation's safe harbor provision.  Therefore, Lobdell has alleged sufficient facts to make it plausible that the Notice's Authorization violates the regulation's confidentiality provisions.

### 3. *Lobdell has standing to challenge whether the Program was 'voluntary' and confidential*

White Cap argues that Lobdell lacks Article III standing to challenge the wellness program since he did not participate in it. (ECF No. 89, PageID.3340). Specifically, White Cap argues that Lobdell "averred in the SAC that he never participated in a medical examination in connection with the Annual Physical Credit," "never signed the Notice, never participated in an Annual Physical Screening, and never had his screening results transmitted to a third party." (*Id.*). Thus, White Cap characterizes Lobdell's challenge as a concern about the "risk of future harm *if he were to participate* in the Annual Physical Credit due to the Notice's purported deficiencies," and contends that such a concern does not confer on him Article III standing "to pursue any claims for damages based on technical deficiencies in the Notice itself." (*Id.*) (emphasis in original). This argument lacks merit.

While the ADA provides for a private right of action, to proceed on such a claim in federal court, the plaintiff must have Article III standing. *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 867 (6th Cir. 2020) ("No matter what Congress provides by statute, the plaintiff must still satisfy Article III's standing prerequisites . . ."). Under Article III, to have standing, a plaintiff must satisfy a three-part test. He must have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Lobdell has Article III standing because, by alleging that he "was subjected to biweekly financial penalties" for not participating in the Program, he meets all three prongs

of the test.  (ECF No. 48, PageID.1633)  That is, notwithstanding his non-participation in the Program, Lobdell alleges that he suffered a concrete monetary injury that flowed from unlawful provisions within the Program, and that a ruling in his favor by this Court could rectify his injuries.  In *Bokma v. Performance Food Grp., Inc.*, 783 F. Supp. 3d, 2025 WL 1452042 (E.D. Va. May 20, 2025), the court faced an argument similar to the one advanced by White Cap here.  In *Bokma,* employees who did not complete the tobacco cessation program received a "$600 annual tobacco surcharge that was periodically deducted from their paychecks over the course of the year."  *Bokma*, 783 F. Supp. 3d at 893.  Plaintiffs who did not participate in the program argued that the program violated ERISA.  The defendant employer argued that plaintiffs "cannot suffer an injury from an allegedly non-compliant program in which they did not participate."  *Id*., 894 (internal quotations omitted).  The *Bokma* court found that the surcharge was a concrete, financial injury and that the injury was "fairly traceable" to "Defendant's alleged administration of its non-compliant program" because the defendant "caused them monetary loss by imposing an unlawful fee."  *Bokma*, 783 F. Supp. 3d 882, 894 (internal quotations omitted); *Mehlberg v. Compass Grp. USA, Inc.*, No. 24-CV-04179-SRB, 2025 WL 1260700, at *3 (W.D. Mo. Apr. 15, 2025) (finding standing where defendants imposed an allegedly unlawful fee in violation of a "statutory right not to be charged."); *Lipari-Williams v. Missouri Gaming Co., LLC*, 339 F.R.D. 515, 524 (W.D. Mo. 2021) (holding that "[t]he standing requirement is satisfied here because Plaintiffs have alleged that Defendant caused them monetary loss by imposing a fee that was unlawful.").

White Cap cites *TransUnion LLC v. Ramirez,* 594 U.S. 413, 441 (2021) to support

its claim that Lobdell doesn't have standing because in that case, the Supreme Court held that "the risk of future harm on its own does not support Article III standing . . ." In *TransUnion*, a class of over 8,000 consumers sued a credit reporting agency ("CRA") that maintained their credit files for money damages. The claims were based on allegations that the CRA had incorrectly added an "alert" to their files indicating they were each a "potential match" to a name on a list of foreign terrorists, drug traffickers, and other serious criminals. But, because the CRA had not transmitted those credit files to any third party, the Supreme Court held that the consumers had suffered only a "risk of future harm" that was "too speculative to support Article III standing." *Id.*, at 437-38. Lobdell's claim is different because, as noted above, he alleges that he incurred a financial penalty for not participating in the Program, which is an actual injury, not a risk of future harm. *See AARP*, 226 F. Supp. 3d 7, 18 ("An increase in premiums would certainly constitute an injury.").

For all of these reasons, the Court finds that Lobdell has Article III standing to pursue his claims in this case.

## III.   CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that White Cap's Motion for Judgment on the Pleadings **(ECF No. 89)** be **DENIED.**

Dated: December 10, 2025                      s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge

21

**NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 10, 2025.

<div style="margin-left:50%">
s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
</div>