UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW LOBDELL,

                Plaintiff,

v.

WHITE CAP, LP, WHITE CAP
SUPPLY HOLDINGS, LLC, WHITE
CAP MANAGEMENT, LLC,

                Defendants.

_____/

Civil Action No. 24-11450

Nancy G. Edmunds
United States District Judge

David R. Grand
United States Magistrate Judge

## ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND MOTION TO COMPEL (ECF No. 26)

Plaintiff Matthew Lobdell ("Lobdell") brings this putative class action for alleged violations of the Americans with Disabilities Act ("ADA") against defendants White Cap Supply Holdings, LLC, White Cap Management, LLC, and White Cap, L.P. (collectively, "White Cap"). In short, Lobdell used to work for White Cap, and he now challenges the legality of its "Health Screen Program" (the "Program") that requires employee participants to submit to annual medical exams and biometric testing in order to receive a "credit" towards the cost of their health insurance.

Before the Court for hearing and determination is Lobdell's Motion to Certify Class and Motion to Compel. (ECF No. 26). Specifically, Lobdell asks the Court to certify a class defined as "all current and former White Cap employees subject to the [Program] in

2021 to present,"[1] and to compel White Cap to produce information about the class members and provide them with notice of the suit. (*Id.*, PageID.812-13). White Cap responded to the motion and Lobdell replied. (ECF Nos. 52, 75).[2] On October 22, 2025, the Court held oral argument on the motion. For the reasons set forth below, the Court will deny Lobdell's motion.

**Background**

White Cap runs a self-funded health benefits ("insurance") plan for its employees. (ECF No. 48, PageID.1629). Employees who enroll in the insurance plan pay a premium, which is deducted from their bi-weekly paychecks. (*Id.*; ECF No. 89, PageID.3318). Employees can receive a discount on their premiums, called an Annual Physical Credit (the "Credit"), by participating in White Cap's Health Screen Program (the "Program"). (ECF No. 48, PageID.1630). The Program requires that participants receive medical exams and biometric testing. (*Id.*, PageID.1629). If the screening results in a diagnosis of a chronic condition, then the employee, and a spouse if also enrolled, must participate in White Cap's

---

[1] He also asks the Court to certify a "subclass of all current and former employees denied the Credit during any pay period from 2021 to present." (*Id.*, PageID.812).

[2] About a month before the hearing on Lobdell's class certification motion, White Cap filed an "amended opposition," contending it did so "pursuant to the Court's directive at the June 3, 2025[] oral argument on [Lobdell's] Motion to Compel . . ." (ECF No. 114, PageID.4237). Lobdell disagrees that the Court invited the type of supplemental briefing contained in White Cap's filing, and thus moved to strike it. (ECF No. 116). While White Cap's amended response contains some supplementation/clarification that it perhaps could have included in its earlier response, it also cites to deposition testimony and information that was not reasonably available at that time. (*See* ECF No. 118, PageID.4376-78). Moreover, as will be shown below, that testimony and information merely further supports arguments already persuasively made in White Cap's prior brief. Finally, White Cap filed its amended response almost a full month before the hearing on Lobdell's class certification motion, giving Lobdell an opportunity to address it in writing or at the hearing. Accordingly, **IT IS ORDERED** that Lobdell's motion to strike **(ECF No. 116)** is **DENIED**.

Chronic Condition Management Program ("CCMP") to receive the Credit. (*Id.*, PageID.1630). The CCMP requires that participants adhere to a treatment plan. (*Id.*, PageID.1647). Even employees who do not participate in the Health Screen Program may qualify for participation in the CCMP, although they won't receive the discount on their premiums unless they also complete testing to comply with the Program's requirements. (ECF No. 59, PageID.2340).

White Cap uses third parties to administer the Health Screen Program. When signing up for the Program, employees sign a notice and authorization form that tells them their data will be shared with third parties to execute the Program.[3] White Cap receives information about which employees have successfully completed the Health Screen Program and whether required employees have completed the CCMP, so it knows how much to deduct from each employee's paycheck. (ECF No. 48, PageID.1648).

In 2020, Lobdell began working as a Licensed Commercial Driver for CSI Geoturf. (ECF No. 48, PageID.1628). In 2022, White Cap acquired CSI Geoturf and transitioned Lobdell to its insurance plan. (*Id.*, PageID.1629). As a new employee, Lobdell automatically received the Annual Physical Credit for the remainder of the first calendar year in which he enrolled in the insurance plan. (*Id.*, PageID.1649). Therefore, for the first year of his enrollment, White Cap deducted $68.46 from each of Lobdell's bi-weekly paychecks to pay for his insurance premium. (*Id.*, PageID.1629). White Cap told Lobdell

---

[3] Prior to 2022, Humana Insurance Company was the administrator of White Cap's wellness Program. (ECF No. 82, PageID.3154). Since then, eHealthScreenings has been the Program's administrator. (ECF No. 59, PageID.2339).

that the following year, unless he participated in the Program by submitting an "Annual Physical Screening Form" by December 31st, he would not receive the Credit, and thus would have an additional $41.94 to $63.50 deducted per paycheck for the cost of his premium. (*Id.*, PageID.1631-32; ECF No. 73, PageID.2644). In 2022 , Lobdell did not submit an "Annual Physical Screening Form" and thus did not participate in the Health Screen Program. (ECF No. 48, PageID.1633-34). As a result, White Cap deducted about $63 more from each of his paychecks than it had during his first year of employment, or a total of about $131 per paycheck during 2023.[4] (*Id.*).

In 2023, Lobdell was again able to sign up for the insurance policy and the Program, which would take effect in 2024. (ECF No. 73, PageID.2644-45). The annual enrollment period in 2023 was between October 18 and November 1, and employees had until December 31st to submit their "Annual Physical Screening Form" or "they would not receive the discount to their health insurance premiums the following year." (ECF No.73-3, PageID.2726; ECF No. 73, PageID.2645. 2805). In 2023, Lobdell did not submit the "Annual Physical Screening Form" and he thus received deductions from his paycheck the following year, until he resigned in February of 2024. (ECF No. 75, PageID.2805).

On June 3, 2024, Lobdell filed his initial complaint in this case.[5] Lobdell alleges that White Cap's Health Screen Program violates the ADA in two principal ways. First,

---

[4] In 2022, White Cap deducted $131.30 from his paycheck for the cost of the insurance premium and in 2023, White Cap deducted $131.96. (ECF No. 48, PageID.1633-34).

[5] The second amended complaint, filed on May 20, 2025, is the operative complaint. (ECF No. 48).

he alleges that only "voluntary" medical examinations are allowed by the ADA[6], and that by tying the Annual Physical Credit to the employee's submission to a medical exam, the employees are not doing so "voluntarily." (ECF No. 48, PageID.1644-46). In other words, Lobdell views the Annual Physical Credit as coercive, and views the withholding of that Credit from employees who choose not to participate in the Program as a "financial penalty." Lobdell also argues that Program does not adequately inform employees as to what medical data will be shared and with whom, as required by 'voluntary' programs according to the ADA. 29 C.F.R. § 1630.14(2)(iv).

Second, Lobdell alleges that White Cap requires participating employees to consent to the release of their confidential medical information in violation of the ADA's confidentiality requirements for employer-run wellness programs, found in 29 C.F.R. § 1630.14(4). (ECF No. 48, PageID.1648-49).

As to the above claims, Lobdell now seeks to certify a class of "all current and former White Cap employees subject to the [Program] in 2021 to present,"[7] as well as a

---

[6] The salient ADA provisions provide, "(A) . . . A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity," and "(B) . . . A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(A), (B).

[7] In his operative second amended complaint, Lobdell confusingly asserts that the class "also includes" all such affected employees "during any pay-period from (a) 2021 to present, *and also* (b) prior to 2021." (ECF No. 48, PageID.1636) (emphasis in original). However, as discussed below, the statute of limitations bars Lobdell's claims for damages prior to 2024, so his attempt to include pre-2021 class members is moot. *See infra* at 9-16.

"subclass of all current and former employees denied the Credit during any pay period from 2021 to present." (ECF No. 26, PageID.812). Thus, Lobdell's proposed class would include employees whether or not they participated in the Program, whether or not the bi-weekly credit/penalty was a significant or modest percentage of their respective paychecks, and whether or not they received the Annual Physical Credit or were "penalized" for not participating in the Program. This expansive view of the class is consistent with Lobdell's broad view of his claim; as he puts it, he "asserts one claim on behalf of himself and the class. Plaintiff seeks to prove that the [Program] violated the ADA." (*Id.*, PageID.803).

As discussed below, there are numerous issues with Lobdell's request to certify the proposed class, and his instant motion will be denied.

**Standard of Review**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). In order to justify a departure from this general rule, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* at 348-49 (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). A district court may certify a class only after it has conducted a "rigorous analysis" to ensure that the proposed class comports with the requirements of Fed. R. Civ. P. 23. *Id.* at 351. "In the class action context, a district court is given 'substantial discretion in determining whether to certify a class, as it possesses the inherent power to manage and control its own pending litigation.'" *Sandusky Wellness Ctr., LLC v. ASD Specialty*

6

*Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017) (internal citation omitted).

Under Rule 23(a), the party seeking certification must demonstrate by a preponderance of the evidence that:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).   "The Rule's four requirements – numerosity, commonality, typicality, and adequate representation – effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Dukes*, 564 U.S. at 349 (internal citations omitted).

In addition to the four requirements explicitly set forth in Rule 23(a), the party seeking class certification must also show that the proposed class is ascertainable by reference to objective criteria. *See Coulter-Owens v. Time, Inc.*, 308 F.R.D. 524, 530 (E.D. Mich. 2015) ("An ascertainable class is 'an implied prerequisite of Federal Rule of Civil Procedure 23.'") (quoting *In re OnStar Contract Litig.*, 278 F.R.D. 352, 373 (E.D. Mich. 2011)); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 44-45 (2d Cir. 2006).  As the Sixth Circuit has held:

For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria.

*Young v. Nationwide Mutual Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (quoting MOORE'S

7

FEDERAL PRACTICE § 23.21[3]).

In addition, class certification is only appropriate where the moving party can meet the requirements of Fed. R. Civ. P. 23(b), which provides:

> (b) **Types of Class Actions**.  A class action may be maintained if Rule 23(a) is satisfied and if:
>
> (1)     prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A)     inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> >
> > (B)     adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2)     the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3)     the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.   The matters pertinent to these findings include:
>
> > (A)     the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

8

> > (C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> > (D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

Lobdell seeks to certify a class under Rule 23(b)(3).  (ECF No. 26, PageID.807).

**Analysis**

### 1.     *Lobdell Did Not Fail to Exhaust Administrative Remedies*

Before addressing whether Lobdell has met the requirements for class certification under Fed. R. Civ. P. 23, the Court must first address whether he has met certain procedural prerequisites for bringing an action under the ADA.  "Before a plaintiff can bring suit in federal court alleging ADA violations, he must exhaust his administrative remedies by filing a charge of discrimination with the EEOC.  []  The claim must also be timely.  The plaintiff has 300 days from the alleged discrimination to file a charge or else lose the right to bring the claim." *Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 760 (6th Cir. 2025) (internal citations omitted).

On March 18, 2024, Lobdell filed his first EEOC charge of discrimination under the ADA as to White Cap's wellness Program.  (ECF No. 23-22).  This charge focused on Lobdell's religious and "personal belief" objections to the Program but explicitly objected to being "financially penalized" for refusing to participate in the Program:

> My employer has a voluntary wellness program that collects the medical, genetic, and biometric information of those who participate. This wellness program violates my sincerely held religious beliefs. Due to this, I refused to participate in the wellness program.  Since I refused to participate in the wellness program, my employer

9

> discriminated against me by charging me significantly higher costs for my healthcare insurance.  This wellness program violates both my sincerely held religious beliefs and personal belief system.  I should not be financially penalized for refusing to share my genetic data according to the GINA act. Due to the stress and loss of respect from my supervisors over this issue, I ended up resigning in late January 2024.

(*Id.*).

On May 1, 2024, Lobdell filed his second EEOC charge of discrimination, this time focusing on the Program's alleged violation of the ADA, and still characterizing as a "penalty" the consequence of an employee's refusal to participate in the Program:

> White Cap institutes a Wellness Plan that requires employees to provide genetic and biometric data or face a penalty of at least $1,500.00 per year. White Cap's Wellness Plan violates the ADA and GINA. This charge is filed on behalf of Mr. Lobdell and all current and former employees who were required to participate in White Cap's Wellness Plan, or pay a fine.

(ECF No. 23-23).

White Cap argues that Lobdell "failed to file a timely, valid, or representative EEOC charge under the ADA, foreclosing both his individual claim and any attempt at class certification." (ECF No. 52, PageID.1981).  In support of this argument, White Cap asserts that Lobdell's first charge "raised only personal religious objections to the Wellness Program" and that the "300-day limitations period began no later than December 2022, when Plaintiff admits he knew of the Wellness Program's terms, objected, and refused to participate."  (ECF No. 52, PageID.1981).  These arguments lack merit, though, as discussed below, their proper resolution does not permit Lobdell's claims to reach back as far as he suggests.

10

First, the Court considers White Cap's challenge to the contents of Lobdell's EEOC charges. The law provides that to exhaust a claim, an EEOC charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). As the Sixth Circuit has explained,

> [t]his rule serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion.... At the same time, because aggrieved employees—and not attorneys— usually file charges with the EEOC, their *pro se* complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge.

*Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).

The standard for whether a claim is reasonably included in the EEOC charge is whether "the charged claim would prompt the EEOC to investigate" the uncharged claim. *Davis v. Sodexho,* 157 F.3d 460, 463 (6th Cir.1998). Although Lobdell's first charge does not reference the ADA, construing it liberally in light of his *pro se* status at the time, it reflects the substantive challenge in the current case – the incurrence of a "financial penalty" for refusing to participate in a wellness program that requires participants to submit to medical examinations. Moreover, implicit in the charge is that the same consequence would befall any employee who failed to participate. Thus, the Court finds that Lobdell's instant ADA claims "are reasonably related to or grow out of the factual allegations in" his first EEOC charge, and that that first charge would prompt the EEOC to

11

investigate his ADA claims.  *See id.*; *Younis*, 610 F.3d at 361.[8]  White Cap's challenge to the contents of the charge therefore fails.

White Cap also challenges the timeliness of Lobdell's EEOC charges.  Specifically, White Cap argues that Lobdell's charges were untimely because "[t]he 300-day limitations period began no later than December 2022, when [he] admits he knew of the Wellness Program's terms, objected, and refused to participate."  (ECF No. 52, PageID.1981).  In other words, White Cap argues that because Lobdell did not act within 300 days of first learning of the Program's alleged illegal terms, he could never challenge the Program in the future.  At least in terms of the knock-out blow it seeks, this argument lacks merit.  As the U.S. Supreme Court has explained, "[t]he existence of past acts and the employee's prior knowledge of their occurrence [] does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102 (2002).

White Cap relies principally on *Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001).  (ECF No. 52, PageID.1981-82).  The case holds that "the starting date for the 300–day limitations period is when the plaintiff learns of the employment decision itself, not

---

[8] At any rate, the second charge clearly exhausted Lobdell's instant ADA claims, as it identifies the ADA as the relevant statute and asserts that his rights thereunder are violated because White Cap's "Wellness Plan [] requires employees to provide genetic and biometric data or face a penalty of at least $1,500.00 per year."  (ECF No. 23-23).  In this charge, Lobdell also specifically references the potential for a class action suit, writing that "[t]his charge is filed on behalf of Mr. Lobdell and all current and former employees who were required to participate in White Cap's Wellness Plan, or pay a fine."  (*Id.*).  Under the Court's below analysis, even considering only the second charge as having exhausted Lobdell's ADA claims, the salient damages period would be the same.

12

when the plaintiff learns that the employment decision may have been discriminatorily motivated." *Amini*, 259 F.3d at 499. But as the distinguishable facts of *Amini* make clear, that holding has no bearing on the instant issue. In *Amini*, the plaintiff, an Iranian-born Muslim, applied in October 1998 for a tenure-track position at Oberlin College. Amini received a letter on January 12, 1999, advising him he was not selected. Amini took no action at the time to challenge the college's decision, but on September 16, 1999, he learned that Oberlin had hired a younger white male. On December 9, 1999, Amini filed an EEOC charge, asserting that in not hiring him, Oberlin discriminated against him on the basis of age, race, national origin, and religion. In holding that Amini's EEOC charge was untimely, the court found that Amini "learned of his injury when Oberlin informed him that he would not be hired . . ." *Amini*, 259 F.3d at 500. Since that alleged discriminatory event occurred on January 12, 1999, Amini had 300 days from that point to file his EEOC charge, making his December 9, 1999 charge untimely.

The instant case is different. White Cap's employees have an annual enrollment period where they make an election to opt in or out of the Program for the next calendar year, regardless of their prior year election. Given that fresh start, each new annual enrollment decision involves a new act of alleged discrimination which starts a new statute of limitations. This view is consistent with U.S. Supreme Court caselaw and other instructive precedent.

In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court held that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act," so a charge "must be filed within the [] 300–day time period after the discrete

13

discriminatory act occurred." *Id.* at 113. *See also Ledbetter v. The Goodyear Tire & Rubber Co.,* 550 U.S. 618, 636 (2007) ("a freestanding violation may always be charged within its own charging period regardless of its connection to other violations.") (overturned in other respects due to legislative action (Jan. 29, 2009)). While the parties in this case have not identified any cases directly on point, the law as to ADA accommodations requests are instructive. For example, in *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121 (1st Cir. 2009), the First Circuit Court of Appeals explained that "the denial of a disabled employee's request for accommodation starts the clock running on the day it occurs." *Id.* at 130. It further explained that while an "employee may not extend or circumvent the limitations period by requesting modification or reversal of an employer's prior action," "it is apparent from the Supreme Court's discussions in *Morgan* and *Ledbetter* that an employee who renews his request for particular accommodations may bring suit based on a new 'discrete act' of discrimination if the employer again denies his request." *Id.* at 131 (citations omitted). *See also Hill v. Hampstead Lester Morton Ct. Partners LP*, 581 F. App'x 178, 181 (4th Cir. 2014) ("a plaintiff who renews a request for a previously denied accommodation 'may bring suit based on a new 'discrete act' of discrimination if the [defendant] again denies [the] request,' *Tobin[*, 553 F.3d at 131], and the subsequent denial carries its own, independent limitations period, *Cherosky v. Henderson*, 330 F.3d 1243, 1248 (9th Cir. 2003) (explaining that if a plaintiff's 'new [accommodation] request results in a denial, the time period begins to run anew')."); *Owens-Hart v. Howard Univ.*, 220 F. Supp. 3d 81, 93 (D.D.C. 2016) ("A new request for the same accommodation will restart the statute of limitations clock, but a mere request for

14

reconsideration of a prior denial will not."). Thus, an employee whose accommodation request is denied but continues working for the employer must file an EEOC charge within 300 days of the denial, although a new accommodation request that is denied will commence a new 300-day window.

Applying this body of law to Lobdell's case makes clear that he properly exhausted his ADA claims which grow out of his 2023 election not to participate in the Program, but no other claims. In 2022, Lobdell had until December 31st to elect to participate in the Program for 2023, in which case he would receive the Credit, or decline to participate, in which case he would incur a "penalty" that he claims violated his rights under the ADA. But Lobdell did not file an EEOC charge within 300 days of making that election, or even within 300-days of the new Program year taking effect. Thus, as in the disability accommodation context, Lobdell's claims that flow from his 2022 decision not to participate in the Program in 2023 are time-barred.

However, when it came to Lobdell's 2024 benefits, a new annual enrollment period of between October 18 and November 1, 2023 applied, and Lobdell had until December 31, 2023, to submit an "Annual Physical Screening Form," which would enroll him in the Program for 2024. (ECF No.73-3, PageID.2726; ECF No. 73, PageID.2645. 2805). Otherwise, he would not receive the Credit during 2024. The 2023 annual enrollment procedure started a new 300-day limitations period because it required a new decision by Lobdell and because any alleged harm he suffered in 2024 resulted from his decision at that time not to participate in the Program, not from a decision he made previously.

Accordingly, as to Lobdell's claims related to his 2023 election and the alleged "penalties"

he incurred in 2024, his EEOC charge, filed on March 18, 2024, was timely.[9]

### 2.      Motion to Certify Class[10]

---

[9] On the flip side, for all of the reasons explained above, Lobdell did not timely exhaust claims for damages he allegedly incurred prior to 2024, and that analysis is not saved by the fact that the ADA, 42 U.S.C. § 12117(a), incorporates the Lilly Ledbetter Fair Pay Act of 2009, 42 U.S.C. § 2000e-5(e)(3)(A), which provides, "an unlawful employment practice occurs, with respect to discrimination in compensation . . . when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." *See e.g., Davis v. Bombardier Transp. Holdings (USA) Inc.*, 794 F.3d 266, 271 (2d Cir. 2015) (holding that although the Fair Pay Act applied in the ADA context, such application is limited to "traditional pay-discrimination claims rather than to a pay reduction that flows from another adverse employment action."); *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1181 (10th Cir. 2011) ("To prove such a claim, it isn't enough for an employee to show that a discriminatory practice somehow affected his or her pay.  . . . 'discrimination in compensation' requires not just *any* effect on pay, but one of a particular kind: unequal pay for equal work.") (emphasis in original); *Cerjanec v. FCA US, LLC*, No. 17-10619, 2017 WL 6407337, at *9 (E.D. Mich. Dec. 15, 2017) (holding that Ledbetter Act did not apply because challenged practice affected "not just salary, but annual bonuses, promotions, retirement benefits, medical costs, as well as 'other privileges and benefits.'"). Moreover, on June 6, 2025, the Court entered an Order denying Lobdell's motion to compel information related to employees who worked at White Cap going back to 2021.  (ECF No. 69). The Court explained in detail on the record why Lobdell's argument, that the "continuing violations doctrine" permitted him to seek damages back to 2021, was flawed.  The Court expressly invited Lobdell to file a motion for reconsideration on that issue if he had case law to support his position, but he did not do so.  (*Id.*, PageID.2576-77).  This is all reason alone to reject the class as proposed by Lobdell, which would encompass at least "all current and former White Cap employees subject to the [Program] in 2021 to present."

[10] Lobdell argues that his Motion to Certify Class should be treated as unopposed since White Cap filed its response (ECF No. 52) after the deadline.  (ECF No. 75, PageID.2803).  The Court will consider White Cap's response as Lobdell filed his motion before being deposed and White Cap, on that basis, timely and reasonably filed a motion to stay its response deadline.  (ECF No. 33). Moreover, on June 23, 2025, the Court held a telephonic status conference with the parties and found the issue moot as White Cap had by then filed its response and Lobdell was not prejudiced. (*See* 6/23/25 text entry).

Lobdell also argues that White Cap contradicts itself in its Motion to Bifurcate (ECF No. 33) and

### a.   *Numerosity*

Rule 23(a)(1) mandates that the class be "so numerous that joinder is impracticable." Fed. R. Civ. P. 23(a)(1).  Because "[t]here is no strict numerical test for determining the impracticability of joinder," *In re Am. Med. Sys.*, 75 F.3d at 1079, "[t]he numerosity requirement requires examination of the specific facts of each case." *Gen. Tel. Co. v. Equal Emp't Opportunity Comm'n*, 446 U.S. 318, 330 (1980).  The modern trend for meeting this factor is to require at least "21 [to] 40 class members."  *Davidson*, 302 F.R.D. at 436 (internal citations omitted).  In the Eastern District of Michigan, "it is generally accepted that a class of 40 or more members is sufficient to satisfy the numerosity requirement." *Id.* (citing *Crawford v. TRW Auto. U.S. LLC*, No. 06-14276, 2007 WL 851627, at *3 (E.D. Mich. Mar. 21, 2007)).

In his motion, Lobdell alleges that there are "8,405 to 9,492 individuals penalized under the Policy," which would be in the proposed class.  (ECF No. 26, PageID.798). However, he later amends these numbers, writing that there are between "865-2,550 employees" who were "penalized from 2021 to present (excluding those who were 'flagged' for a chronic condition and still penalized after submitting their results)."  (ECF No. 75, PageID.2803).  Even with these new numbers (and considering the Court's ruling

its Response to the instant motion (ECF No. 114).  Although White Cap refers to the presence of "class-wide" and "common" evidence in its Motion to Bifurcate, the Court does not see these phrases as substantive concessions that class certification is proper.  The Motion to Bifurcate revolves around what discovery is appropriate, and discovery depends on whether Lobdell is representing himself or a class, which was unknown at the time White Cap filed its Motion to Bifurcate.

above on the statute of limitations issues), Lobdell's proposed class appears to be sufficiently large to satisfy the numerosity requirement. *Davidson*, 302 F.R.D. at 436.

### b. *Commonality*

The second factor is commonality, which requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The plaintiff must identify "a common contention . . . capable of classwide resolution – which means its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "In cases involving the question of whether a defendant has acted through an illegal policy or procedure, commonality is readily shown because the common question becomes whether the defendant in fact acted through the illegal policy or procedure." *Saur v. Snappy Apple Farms, Inc.*, 203 F.R.D. 281, 287 (W.D. Mich. 2001). But even when a single program or policy is at issue, "[w]hat matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (internal quotations omitted).

Lobdell argues that the Court should find commonality here because he is challenging a "company-wide policy of discrimination." (ECF No. 26, PageID.800). Specifically, he argues that he is challenging "the legality of a policy (common issue of law) that is uniformly applied (common issue of fact), and alleges an injury from that policy (common issue of fact)." (ECF No. 26, PageID.801-02). But although Lobdell raises a common question, in the broadest possible terms – whether the Program "violated the

18

ADA" – the information in the record does not suggest a common answer as to the class he proposes.  (ECF No. 26, PageID.803).

Two key issues divide the class Lobdell proposes: (1) the notice of how a participant's data would be shared depending on what aspects of the Program he or she participated in, and (2) the coercive impact of the financial credit/penalty.  Since different employees will have different answers to these questions, and different experiences vis-à-vis the Program, no "common contention … capable of classwide resolution" exists. *Dukes*, 564 U.S. at 350.

Starting with the first issue, Lobdell's proposed class doesn't meet the commonality requirement because only some of White Cap's employees were required to enroll in the Chronic Care Management Program ("CCMP"), and those employees were allegedly required to share more of their health data than other employees.  According to Lobdell, White Cap learned additional information from these employees "through failed adherence to the [CCMP]."  (ECF No. 48, PageID.1648).  The CCMP also presents distinct issues, specifically, whether employees were on notice that their participation in that program involved sharing additional information with White Cap.  As the Court recently explained in its Report and Recommendation to deny White Cap's Motion for Judgment on the Pleadings, it is possible that the Program violated the ADA as to these individuals specifically because of their involvement in the CCMP, but that would not make the Program unlawful as to other employees.  (ECF No. 119, PageID.4407).  Therefore, the sweeping class Lobdell proposes includes groups of individuals for whom the question of whether the Program was coercive as to the issue of notice may not be the same.

The second question, about financial coercion, also cannot be answered as to the broad class Lobdell proposes in "one stroke" because the coercive impact of the Annual Physical Credit depends in large part on each employee's income. (*See Id.*, PageID.4401-02). While there may be a group of employees who, based on the amount of the non-participation "penalty" relative to their income, feel coerced to participate in the Program, Lobdell has not shown that such coercion applies across all employee incomes. At least as presently defined, the "coercion" question – which speaks to the heart of the Program's voluntariness, and thus, legality – cannot be answered in "one stroke." Indeed, Lobdell's proposed class of "all current and former White Cap employees subject to the [Program] in 2021 to present" would include not only employees who participated in the Program because they felt financially coerced to do so, but also those who participated because they found its terms and benefits attractive. (ECF No. 26, PageID.812). Conversely, Lobdell's proposed class includes employees who opted out of the Program for reasons unrelated to the issues he raises in this case. Thus, there is a lack of commonality amongst the diverse groups of employees who would comprise the vast proposed class.

The cases Lobdell relies on are distinguishable. For instance, he cites to *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 (1982), for the proposition that "[c]ourts routinely find both [the commonality and typicality] requirements met where, like here, an employer implements a company-wide policy of discrimination." (ECF No. 26, PageID.800). But in *Falcon*, a case in which a Mexican-American plaintiff sued his employer for race discrimination in its hiring and promotion practices, the Court actually found the plaintiff had provided "an insufficient basis for concluding that the adjudication of his claim of

20

discrimination in promotion would require the decision of any common question concerning the failure of [the employer] to hire more Mexican-Americans." *Falcon*, 457 U.S. at 158. The quote Lobdell cites (parenthetically) is in footnote 15 of the *Falcon* decision, in which the Court explained that "[i]f [the employer] *used a biased testing procedure* to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements . . ." *Id.* at 158 n. 15 (emphasis added). The "commonality" thread in the Court's hypothetical was the existence of a biased testing procedure that is used across the board; if the procedure was "biased," then it was biased as to all employees subjected to it, and they all share that commonality. Here, however, there is no such commonality; a purported "penalty" that might be coercive to one employee might be considered a welcomed "discount" or "credit" to another.

Lobdell also relies on *Thrope v. State of Ohio*, 173 F.R.D. 483, 488 (S.D. Ohio 1997). (ECF No. 26, PageID.800-01). In that case, the plaintiff, a disabled individual, sued the State of Ohio, challenging under the ADA a statute that required persons with disabilities that satisfy certain criteria to pay a $5.00 fee to obtain a removable windshield placard. *Thrope*, 173 F.R.D. at 486. The plaintiff moved to certify a class of all residents who purchased the placard. In finding the plaintiff had established Rule 23(a)'s commonality requirements, the court explained:

> A lawsuit filed by any member of the putative class would require resolution of the same legal issue—whether the Ohio statute placing a

21

surcharge on the obtainment of a permanent windshield placard violates the ADA. It is alleged that each of the class members

> (1) have (or transport persons who have) disabilities as described by Ohio Revised Code Section 4503.44; (2) have (or transport persons with) disabilities within the meaning of the Americans with Disabilities Act; (3) have been, or will in the future be, required to purchase parking permanent windshield placards; and (4) have been, or will be, required to pay Defendants in order to receive permanent windshield placards allowing use of parking spaces set aside for the exclusive use of persons with disabilities.

> All members of the putative class have been affected in the same way by Defendant's general statutory scheme, that of charging a fee for the obtainment of a placard, and the general statutory scheme is the focus of this litigation. Therefore, the issues of liability are identical as to all class members.

*Thrope*, 173 F.R.D. at 488–89.

The key point in *Thrope* is that the statute requiring payment for the placard was either lawful or unlawful as to all members of the class "in the same way," without having to examine their personal circumstances. The same cannot be said of Lobdell's challenge to the Program because it requires an assessment of the Program's voluntariness which, as discussed above, will vary by employee or groups of employees.

Finally, at oral argument, Lobdell relied heavily on *Pickett v. City of Cleveland, Ohio*, 140 F.4th 300, 307 (6th Cir. 2025). In that case, the district court certified a class of more than 900 African-American homeowners in Cuyahoga, Ohio, each of whom was assessed a water lien for unpaid water bills by the City of Cleveland. The plaintiffs' theory was that even though the water department did not know any particular homeowner's race when it issued a water lien, statistics showed the that water liens had a "disparate impact"

22

on African-American homeowners because whereas "White residents make up approximately 59% of the population of Cuyahoga County [] [and] Black residents make up 29% [], roughly 18% of water liens are placed in majority White neighborhoods, while 68% of water liens are placed in majority Black neighborhoods." *Pickett*, 140 F.4th at 305-06. In certifying the proposed class, the district court found a common question of "whether Defendant's disproportionate assessment of water liens on Black homeowners in Cuyahoga County, under [the City's] facially neutral water lien policy, violates the FHA." *Id.* at 307. The Sixth Circuit affirmed that finding in short order, explaining, "[c]ommonality is [] satisfied, because Plaintiffs have demonstrated 'a common question that will yield a common answer for the class ... and that that common answer relates to the actual theory of liability in the case.' Specifically, Plaintiffs suffer according to a common theory of injury under the FHA whose answer will resolve the suit 'in one stroke' for all members of the Class." *Id.* at 308 (citations omitted).

*Pickett* is distinguishable because the principal question to be answered in that case – "whether Defendant's disproportionate assessment of water liens on Black homeowners in Cuyahoga County, under [the City's] facially neutral water lien policy, violates the FHA" –could only be answered by reference to the class as a whole, and "predominate[d] over individualized concerns relating to causation and damages." *Id.*, at 307-08. As discussed above, however, in this case, the question of whether the Program "violated the ADA" turns on the answer to another question – whether the Program is "voluntary" – and that is not one that can be answered for the thousands of White Cap employees at issue "in one stroke." *Dukes*, 564 U.S. at 350.

23

For all of the foregoing reasons, Lobdell's proposed class definition does not meet Rule 23(a)'s commonality requirements.[11]

### c.      *Typicality*

Lobdell's proposed class also fails Rule 23(a)'s typicality requirement.  The Sixth Circuit has explained that "[t]ypicality is met if the class members' claims are fairly encompassed by the named plaintiffs' claims…" *In re Whirlpool Corp.,* 722 F.3d at 852 (internal quotations omitted).  With the typicality requirement, the focus shifts from the characteristics of the class (*i.e.*, numerosity, commonality) to the relationship between the class and the named plaintiffs.  "This requirement insures that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their

---

[11] While Lobdell's commonality arguments lack merit fort the foregoing reasons, it is worth noting the shortcomings of certain of White Cap's arguments.  For example, White Cap argues that Lobdell cannot satisfy the commonality requirement because his claim is grounded in his personal religious and ethical views, rather than defects in the Program that are common to the proposed class. (ECF No. 52, PageID.1996).  White Cap also refers to Lobdell's deposition testimony to demonstrate his "idiosyncratic" objections, asserting, "[Lobdell] called wellness incentives 'vicious profiteering' despite no evidence that anyone profited from his data []; and cited Catholic doctrine to explain his rejection of biometric exams [], but declined to invoke the religious accommodation offered because, in part, he didn't want executives 'talking about [his] religion.'" (*Id.*, PageID.1996-97).  While these objections may be personal to Lobdell, he is not asserting a claim for religious discrimination, and his beliefs do not undermine the claims he asserts based on the Program's financial incentive (or, in his view, "penalty") and its alleged insufficient notice. As discussed below, White Cap's argument goes more to the typicality issue of whether Lobdell's interests "are aligned with the interests of the represented class members . . ." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.,* 722 F.3d 838, 852 (6th Cir. 2013).  White Cap also argues that the class should not be certified because Lobdell's claims lack merit as a matter of law, but the Court has already addressed that argument in its Report and Recommendation on White Cap's Motion for Judgment on the Pleadings, explaining that "[w]hether the Program was compulsive to Lobdell or to a class of employees is a question of fact."  (ECF No. 119, PageID.4399).

24

own interests, the class representatives also advocate the interests of the class members." *Id.*

The concepts of commonality and typicality "tend to merge" in practice because both elements "serve as guideposts" in evaluating whether the claims are sufficiently interrelated so that "the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 349-50 n.5. As noted above, Lobdell combines his commonality and typicality arguments as he argues that his challenge to a "company-wide policy of discrimination" meets the requirements of both commonality and typicality. (ECF No. 26. PageID.800). Likewise, many of White Cap's typicality arguments mirror its commonality arguments. White Cap argues that Lobdell can't be a typical representative because he finds the Credit coercive "solely because he earned less than $50,000" and "whether that amount felt coercive varies widely depending on income, coverage tier, family needs, and personal judgment." (ECF No. 52, PageID.1996). As discussed above, the potential class members' salary levels, which will vary, are relevant to the question of whether the Program is coercive.

Finally, in its most recent briefing, White Cap provides additional evidence which demonstrates why Lobdell's interests in pursuing this litigation are not necessarily aligned with the interests of the proposed class members. For example, in his December 11, 2023 email to a White Cap human resources representative advising that he would not be participating in the Program, Lobdell wrote, "I am refusing this 'health screening' based on my personal, religious beliefs. I **shall not be penalized** in any way, including financially for refusing to participate." (ECF No. 114-1, PageID.4280). Lobdell also

25

wrote, "the health screening is far beyond my personal and religious ethics/morals" and "I do not need or want 'big brother' making sure I take care of myself." (*Id.*, PageID.4277-80).  And, in a later e-mail to a State of Michigan complaint center, Lobdell asserted that he was "[n]ot interested in recovering my funds, I want this to end for the greater good of people." (*Id.*, PageID.4282).

The Court agrees that the differences highlighted by White Cap demonstrate that Lobdell fails Rule 23(a)'s typicality requirement.  Lobdell appears to want nothing to do with a health and wellness benefit program like White Cap's that offers premium discounts for participants who undergo medical examinations, whereas other White Cap employees may be pleased to participate in such a Program.  Lobdell even goes so far as to contend that all such programs are "unethical" regardless of the financial incentive offered.  (ECF No. 51-2, PageID.1941).  The record thus shows that Lobdell, by pursuing his own interests, would not necessarily be advocating for the class members' interests.  He therefore fails to satisfy Rule 23(a)'s typicality requirement.  *In re Whirlpool Corp.,* 722 F.3d at 852.

### d.    *Adequacy of Representation*

The final Rule 23(a) prerequisite considers the adequacy of representation, and requires that the named plaintiffs "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The Sixth Circuit has held that there are two criteria for determining the adequacy of representation: "(1) the representative must have common interests with unnamed members of the class; and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Salem v.*

*Mich. Dept. of Corr.*, No. 13-14567, 2016 WL 7409953, at *6 (E.D. Mich. Dec. 22, 2016) (citing *In re Am. Med. Sys. Inc.*, 75 F.3d at 1083).  At its core, this factor exists to confront "any concerns about the competency of class counsel and any conflicts of interest that may exist."  *Whirlpool*, 722 F.3d at 853 (citing *Dukes*, 564 U.S. at 349-50 n.5).

White Cap provides three reasons why Lobdell is not an adequate class representative: (1) his personal "ideology"; (2) "threshold legal bars not shared by the class"; and (3) that he "lacks the understanding" to represent the class.  For the reasons discussed above, the Court agrees that Lobdell's personal objection to any wellness program that provides an insurance premium credit to participants for undergoing medical exams renders him an inadequate representative of the instant proposed class.[12]

**Conclusion**

For the foregoing reasons, **IT IS ORDERED** that Lobdell's Motion to Certify Class and Motion to Compel **(ECF No. 26)** is **DENIED**.[13]

Dated: February 20, 2026                              s/David R. Grand
Ann Arbor, Michigan                                   DAVID R. GRAND
                                                      United States Magistrate Judge

---

[12] In light of the Court's finding, it need not address in detail White Cap's other arguments.

[13] In addition to seeking certification of the proposed class, Lobdell moves to compel White Cap to produce information about class members and to compel White Cap to issue a Notice to them under Rule 23(c)(2).  Because the Court is denying Lobdell's request to certify the proposed class, his motion to compel is **DENIED AS MOOT**.

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties' attention is drawn to Fed. R. Civ. P. 72(a), which provides a period of fourteen (14) days from the date of receipt of a copy of this order within which to file objections for consideration by the district judge under 28 U. S. C. § 636(b)(1).

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 20, 2026.

s/Julie Owens           
JULIE OWENS
Case Manager

28